F. Lee BAILEY, Plaintiff,

v.

UNITED STATES, Defendant.

No. 96–666C.

United States Court of Federal Claims.

Nov. 21, 2002.

Mark L. Horwitz, Horwitz & Fussell, Orlando, Florida, for the plaintiff and John L. Napier, Winston & Strawn, Washington, D.C., of counsel.

Jeffrey A. Belkin, Commercial Litigation Branch, Civil Division, Department of Justice, David M. Cohen, Director, Commercial Litigation Branch, Robert D. McCallum, Jr., Assistant Attorney General, for the defendant.

## OPINION

HORN, Judge.

Plaintiff brought an action against the government, seeking damages in the amount of $14,389,853.00, for an alleged breach of a contract with the government. The court issued two earlier opinions in this case, denying defendant's motions to dismiss. *See Bailey v. United States,* 40 Fed.Cl. 449 (1998) and 46 Fed.Cl. 187 (2000). Issues addressed in the prior motions included the jurisdictional bar of 28 U.S.C. § 1500 (1994), the doctrine of *res judicata* and the criminal forfeiture statute, 21 U.S.C. § 853 (1994). This opinion is being issued following an extensive opportunity to hear witnesses at trial and a continuing stream of post-trial filings.

## FINDINGS OF FACT

During the trial, it became apparent to the trier of fact that given radically different recollections of the events at issue and the evident animosity between a number of the witnesses for the plaintiff and the defendant, witness credibility had become particularly important as a criteria necessary to determine whether the alleged oral contract between Mr. Bailey and government representatives had come into existence. Witnesses, who purported to be at the same meetings, left the room with radically different recollections of what had occurred. Moreover, during the proceedings before this court, frequent allusions were made by both parties to other proceedings in which this plaintiff was involved. The parties also submitted records from other judicial proceedings in which plaintiff's credibility had been questioned.[1] This court does not question the conclusions reached by the triers of fact in each of those proceedings, during which this judge was not present and had no opportunity to observe the witnesses or review the record. This court has restricted itself, carefully and deliberately, to considering the limited questions over which it believes it has jurisdiction, and to assessing only the witnesses who this judge had an opportunity to personally observe.

With regard to determining credibility, "[t]he factors to be considered in evaluating the testimony of a witness are perception, memory, and narration.... Sometimes a fourth is added, sincerity, but in fact it seems merely to be an aspect of the three already mentioned.... The demeanor of the witness traditionally has been believed to furnish trier and opponent with valuable clues." Fed. R.Evid. art. VIII, Advisory Committee (Introductory Note) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 495–96, 71 S.Ct. 456, 95 L.Ed. 456 (1951)) (balance of citations to texts omitted). Similarly, the United States Court of Appeals for the Third Circuit has stated that:

Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor—his tone of voice, the evidence of fear which grips him at the height of cross-examination, or even his defiance—that his evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy, as well as outright untruthfulness. The demeanor of a witness, as Judge Frank said, is "wordless language." *Broadcast Music Inc. v. Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 (2d Cir.1949). It is in recognition of the superior advantage which observation of the demeanor of the witness confers on the fact finder that a reviewing court must accept as true whatever evidence supports the verdict of a jury and that in trials without a jury Rule 52(a) of the Federal Rules of Civil Procedure provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

1. *See, e.g., United States v. McCorkle*, No. 6:98–CR–52–ORL–19C, Order at 25–26, 31, 2000 WL 33725124, at *9, *11 (M.D.Fla. Sept. 14, 2000) (civil contempt proceedings); *Florida Bar v. Bailey*, 803 So.2d 683, 695 (Fla.2001), *cert. denied*, 535 U.S. 1056, 122 S.Ct. 1916, 152 L.Ed.2d 825 (2002) (disbarment proceedings); *In re F. Lee Bailey*, No. BD–2001–093 (Mass. Mar. 7, 2000) (disbarment proceedings). Mr. Bailey also was held in civil contempt in the United States District Court for the Northern District of Florida (Gainesville Division) for failure to produce Biochem Pharma stock and stock proceeds and to render a full accounting of the stock. *United States v. Duboc*, No. GCR 94–01009, Order, at 4 (N.D.Fla. Feb. 3, 1996). *See United States v. Bailey*, 175 F.3d 966, 967, 970 (11th Cir.) (affirming that the District Court Judge was not required to recuse himself, and reversing and remanding on one expense item denied by the District Court), *reh'g and reh'g en banc denied*, 192 F.3d 132 (1999) (table).

*Government of the Virgin Islands v. Aquino,* 378 F.2d 540, 548 (3rd Cir.1967) (footnote omitted); *see also Riggins v. Nevada,* 504 U.S. 127, 142, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) ("At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand . . . his demeanor can have a great bearing on his credibility, persuasiveness, and on the degree to which he evokes sympathy."); *Clemons v. Mississippi,* 494 U.S. 738, 766, 768, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (" 'The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to make findings of fact which will have the reliability that we need and desire. . . . [O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' ") (quoting *Gavin v. State,* 473 So.2d 952, 955 (1985) and *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)) (footnote omitted); *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) ("It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised."); *United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949) ("Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them."); *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (Cross-examination of a witness provides "an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury [or judge] in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."); *Aetna Life Ins. Co. of Hartford v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891) ("There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury [is] to be guided in determining the weight and credibility of his testimony."); *Haebe v. Dep't of Justice,* 288 F.3d 1288, 1299 (Fed.Cir.2002) ("[G]reat deference must be granted to the trier of fact who has had the opportunity to observe the demeanor of the witnesses, whereas the reviewing body looks only at 'cold records.' ") (quoting *Jackson v. Veterans Admin.,* 768 F.2d 1325, 1331 (Fed.Cir.1985)); *Wright v. United States Postal Serv.,* 183 F.3d 1328, 1334 (Fed.Cir. 1999) (The court noted "the higher level of deference given to credibility determinations that are based on a witness' demeanor.") (citations omitted); *LaRocca v. Gold,* 662 F.2d 144, 149 (2d Cir.1981) ("[T]he jury's [or judge's] task of appraising the credibility of parties and witnesses . . . entitles it to take into account the person's demeanor, conduct, intelligence, and background."); *Gov't of the Canal Zone v. Pinto,* 590 F.2d 1344, 1348 (5th Cir.1979) (" '[O]pportunity to observe demeanor is what in large measure confers depth and meaning upon oath and cross-examination . . . .' ") (quoting Advisory Committee Notes, Rule 804 (1975)); *Harned v. Henderson,* 588 F.2d 12, 24 (2d Cir.1978) (the appellate court, in describing the demeanor of a witness, noted that: " '(Judge Neaher) was there. We were not.' ") (quoting *Duckett v. Silberman,* 568 F.2d 1020, 1024 (2d Cir.1978)).[2]

**2.** As a general matter, in evaluating credibility:

It is proper for the [fact finder] to take into account the appearance, manner, and demeanor of the witness while testifying, his apparent frankness and intelligence, his capacity for consecutive narration of acts and events, the probability of the story related by him, the advantages he appears to have had for gaining accurate information on the subject, the accuracy or retentiveness of his memory as well as the lapse of time affecting it, and even the intonation of his voice and his positiveness or uncertainty in testifying.

81 Am.Jur.2d *Witnesses* § 1038 at 848–49 (1992) (footnotes omitted). *See also* Steven I. Friedland, *On Common Sense and the Evaluation of Witness Credibility,* 40 Case W. Res. L.Rev. 165, 174 (1989/1990) (Credibility determinations in-

As noted above, the court relies on its own evaluation of testimony in the present case for determination of witness credibility, rather than surrogate evaluations in other cases before other fora. As indicated from the bench at the conclusion of the trial of this case, despite the obvious animosity between a number of the numerous witnesses who testified at trial and their various attempts to discredit one another, the court found Assistant United States Attorney (AUSA) Thomas Kirwin, Special Agent Carl Lilley of the United States Drug Enforcement Agency (DEA) and Mr. Bailey to be the most consistently credible of the witnesses testifying at the trial.[3] Such conclusions, however, are comparative in nature, and do not suggest that each and every word of any of these witnesses should be treated as gospel. Nor were all the recollections of events by others totally without credibility, although some molding to fit the situation did seem to occur on the part of some of the witnesses. Furthermore, these general credibility conclusions do not lead to an easy finding as to the alleged liability or the absence thereof regarding the contract plaintiff has alleged came into being between himself and the government. Based on the testimony, although often in each other's presence, the plaintiff and many of the witnesses who appeared at the trial seemed to leave the same physical location, having heard different conversations and with different understandings of what had occurred. Matching the words exchanged at meetings and in writing and the legal effect of those words is the analysis which follows below.

On March 31, 1994, plaintiff was retained by Claude Duboc, who was facing illegal drug trafficking and money laundering charges in the United States District Court for the Northern District of Florida. Pursuant to his representation of Mr. Duboc, in April, 1994, plaintiff and then co-counsel Robert Shapiro began a series of meetings with members of the United States Attorney's Office for the Northern District of Florida to evaluate the case against their client. The relevant meetings are discussed below, chronologically.

On April 13, 1994, plaintiff met with AUSA Gregory Miller, Chief of the Criminal Division and with AUSA Thomas Kirwin. AUSA Miller indicated at this meeting that the government intended to effect a forfeiture of Mr. Duboc's considerable assets,[4] all of which were deemed to be drug related assets.[5]

On April 19, 1994, Mr. Bailey and Mr. Shapiro again met with AUSA Miller, AUSA Kirwin, AUSA Roy Atchison and DEA Agent Carl Lilley. Because all of Mr. Duboc's property was identified as forfeitable, one of the topics discussed at the April 19, 1994 meeting was potential sources for attorneys' fees. Attorney's fees in the amount of $1 million for each of the three [6] defense counsel were discussed. According to the joint stipulations, AUSA Miller stated that such an amount would not be unreasonable, and might be justified given the complexity of the *Duboc* case.

On April 20, 1994, Mr. Bailey, Mr. Shapiro, and Mr. Duboc met with AUSA Atchison, AUSA Kirwin, AUSA Miller and Agent Lilley. Mr. Duboc indicated at the meeting that it was in his best interest to cooperate with the government and disclose his illegal activities, assets and holdings.

On April 25 and 26, 1994, Mr. Duboc and Mr. Bailey again met with various government attorneys and with Agent Lilley. At this meeting, Mr. Duboc identified drug related assets to the government, including accounts containing large sums of cash and stocks, and high value yachts, automobiles,

clude an evaluation of a witness' "demeanor, perception, memory, narration and sincerity.").

3. The court also wishes to commend all counsel in this case for their hard work, excellent presentations and calm demeanor in the public eye.

4. It was anticipated that the forfeiture would be in the neighborhood of $100 million.

5. "Drug related assets" were defined in Mr. Duboc's plea agreement as assets used to facilitate

the commission of illegal drug activities, or which constitute proceeds of illegal drug activity. *United States v. Duboc*, No. GCR 94–01009, Plea and Cooperation Agreement, at 4 (N.D.Fla. May 17, 1994).

6. At this point in time, in addition to Mr. Bailey and Mr. Shapiro, Mr. Duboc also had retained a third attorney, Michael Nassatir.

and residential estates located in France. Also specifically identified as drug related assets were 602,000 shares of Biochem Pharma [7] stock, estimated at the time of the meeting to be worth about ten dollars per share, totalling over $6 million.

At trial, AUSA Kirwin testified that the overseas drug related assets required maintenance prior to being sold, and that some source of funds was necessary for that purpose. The two residential estates in France were thought to be worth approximately $25 million and $6 million, respectively. AUSA Kirwin indicated that the amount of money required to maintain these estates was "extraordinary," estimated at $15,000.00 to $20,000.00 per month. The two yachts located in France were thought to be worth $2,800,000.00 and $900,000.00, respectively. AUSA Kirwin testified that, normally, the United States Marshal's Service would take physical possession of property pending forfeiture, but it was believed that the normal procedures were not possible in the case of property located overseas. Agent Lilley testified that, based on his personal experience with stocks and asset forfeiture, he believed that the government would sell the Biochem Pharma stock immediately. AUSA Kirwin similarly testified that there were discussions indicating that the stock would be sold quickly as a block if it came into the government's custody, an action which would likely depress the value of the stock.

Mr. Bailey offered to assist in the maintenance and repatriation of these high value, drug related assets located overseas. Government attorneys understood that Mr. Bailey possessed contacts in Europe, including banking contacts and a Swiss bank account, and also took into account plaintiff's national reputation. Mr. Bailey was understood by government attorneys to have extensive knowledge of the yacht business. Mr. Bailey's offer to help maintain, liquidate and repatriate the proceeds of Mr. Duboc's overseas drug related assets to the United States was accepted by the government.

On April 26, 1994, Mr. Duboc and Mr. Bailey again met with various government attorneys and with Agent Lilley. AUSA Miller suggested that $3.5 million in one of Mr. Duboc's foreign bank accounts be transferred to Mr. Bailey to cover the overseas property expenses and legal fees. However, Mr. Duboc had expressed concern that if the 602,000 shares of Biochem Pharma stock were sold as a block, that action might depress the stock and have an adverse effect on the company itself. Mr. Duboc also believed the Biochem Pharma stock might rise in value and was interested in this potential in order to maximize his forfeitures, to demonstrate cooperation with the government and seek leniency at his sentencing. Agent Lilley, therefore, suggested that rather than transferring the $3.5 million cash contents of one of Mr. Duboc's foreign bank accounts to Mr. Bailey to fund the maintenance of the overseas drug related assets and attorneys' fees, that the Biochem Pharma stock be transferred to plaintiff instead. Subsequently, this suggestion was adopted and the Biochem Pharma stock was transferred electronically to Mr. Bailey's Swiss bank account.

Also on April 26, 1994, a private meeting was held between AUSA Miller and Mr. Bailey during which the transfer of stock was discussed. Plaintiff testified about the meeting as follows:

Q [by Mr. Horwitz] And what did Mr. Miller say to you?

A [Mr. Bailey] He said, "I want to make it very plain to you, that as these forfeitures take place, the money goes to the U.S. Marshall [sic] for distribution to various points. And you don't have to accept the stock, you can have the cash, but if you choose to accept the stock, which might help the Government, if it goes south there's nothing to pay you with. You run the risk of loss. You'll be taking a gamble," he said, "if you want to do that, that's fine. I just want to warn you we don't have another pot to reach into to help you out."

---

**7.** Biochem Pharma, Inc. was identified as a pharmaceutical company located in Montreal, Canada.

Q Do you remember Mr. Miller using the words risk being yours?

A Yes.

Q Did he also use the word gamble?

A He did.

Q And he placed the gamble on you?

A He said, "You will be gambling."

Q What did you say to that statement by Mr. Miller as to what you wanted to do?

A I agreed to accept the stock in the hope that I could see [sic] it off fast enough so I would come out with at least three and a half million.

AUSA Miller, in turn, testified about this same discussion with plaintiff, as follows:

Q [by Mr. Belkin] Going back to this discussion of two possibilities, have you described to the Court everything that you recall about this discussion of two possibilities?

A [AUSA Miller] Well, as to what I was saying, there were two possibilities on the table. That it was something the defense needed to consider because they were gambling [8] by holding onto this stock. The money could go up in value or the money could go down in value. It's not necessarily that Duboc is going to get greater credit if the stocks didn't go up as he anticipated. Very easily they could have gone done [sic].

But both Mr. Duboc and Mr. Bailey were very, very, very convinced in their representations to us that that was not a likelihood. They said they were going to go up.

AUSA Miller further testified as follows:

Q As of the close of the workday, the business day on April 26th, [1994] what was your understanding of the arrangement with respect to the Biochem Pharma stock?

A At the close of the 26th, [1994] we had agreed that we would make available, not call in, because it was still his client's money, we were going to allow his client to transfer to his attorney the funds of the stocks that were Biochem Pharma stocks; that it was understood that ultimately those properties would be forfeited pursuant to whatever plea agreement we reached with Mr. Bailey and Mr. Duboc; that those profits and those stocks would be forwarded to us at the conclusion or whenever we called for them. But we were agreeing to defer calling them, allowing them to be used for the management of the properties over the—the real properties over in France, and ultimately we were going to make available to the court, at least tell the court that there was a pool of money or stock that had been set aside from which the court at the conclusion of the case with our consent would make available for the payment of attorney's fees, reasonable fees, to the defense for costs and fees related to this matter.

Q Is there a document that was created referencing defense counsel's holding of these stocks?

A There was nothing, no documents created that dealt with that.

Q Why did that not happen?

A I didn't believe at that time it was necessary to do that. That was a situation between an attorney and his client as to how he was going to be managing his client's property. That stock that was given to Mr. Bailey was not our stock. It was not titled to us. It was—we had no lawful title to that or right to that until the court said that we had a right or a title to it. We had a good argument that it was forfeitable to us and we would have ultimately—in my mind, we would have ultimately obtain [sic] that stock, but we had no right to

8. At other points in his testimony, AUSA Miller discussed his use of the term "gambling," as follows: "I told him [Mr. Bailey] that it was a gamble for he [sic] and for his clients, that they may not be able to generate the amount of monies that they hoped to have. They may come out less then [sic] they turned it into the government than what it was worth when they first had it. It could have been $3 million they surrendered to the government. They [sic] could have been $8 million. It could have been anything, but it was a gamble." Also, at another point in AUSA Miller's testimony: "It was a gamble for both him [Mr. Bailey] and his client. Both of them were gambling. Both he and his client were gambling that it could go up, it could go down, they wouldn't accomplish the purpose of what they hoped to do. I did tell him it was a gamble, that's correct."

legal title to it, so we turned—we allowed his client to turn over stock to Mr. Bailey to hold onto with directions given to him by his client, which were also consistent with the directions we gave to Claude [Duboc], who was trying to please us at the time, as to what he was doing to cooperate with us.

AUSA Miller subsequently testified that he viewed the arrangement as one in which plaintiff held the stock transferred to him by Mr. Duboc in trust, with both Mr. Duboc and the government being the beneficiaries of the trust:

> To the extent—the trust was—in a legal sense his client had funds that he owned, or property that he owned that he transferred to his attorney. We were going to be a beneficiary. The fact that he's holding them in trust, we are the beneficiaries of that trust as much as his client are [sic] beneficiaries to that trust. To say it's a trust between the government and Mr. Bailey is not really placed—the properties were not placed in trust by the government to Mr. Bailey. They were transferred directly from his client it [sic] Mr. Bailey to be held in trust with the expectation that the United States would be a beneficiary to that trust.
>
> To the extent that it's a trust where we are a party of it, we are ultimately going to gain the benefit of that trust, so would Mr. Duboc.

AUSA Miller also testified that, with the selection of the Biochem Pharma stock rather than funds in a bank account, the stock would be the only asset made available for the upkeep of the overseas property and for attorneys' fees. If the value of the stock were to be reduced significantly, AUSA Miller indicated that there might not be funds available for the overseas property expenses or for attorneys' fees, including reimbursement for expenses incurred, because the stock was the asset being made available for those purposes. AUSA Kirwin's testimony similarly indicated his understanding that the Biochem Pharma stock was the only source of funds, and if the stock lost its value, there would be no funds for overseas property expenses or for attorneys' fees.

AUSA McGee testified about being concerned in April, 1994, about plaintiff's repatriation role generating conflicts of interest. "[T]he government cannot pay a defense attorney to represent a client. You can't have him on your payroll at the same time that he represents a Defendant before you. There's a huge conflict of interest inherent in that and it—you couldn't do it, the Judge wouldn't permit it. The Florida Bar wouldn't permit it." AUSA McGee further testified that:

> The United States should not be responsible for Mr. Bailey being paid. We should not take a position on that. At the same time, we thought it inappropriate to deprive Mr. Bailey of the opportunity to make the argument that he wished to make, which is that he should be paid from these forfeitable funds. So my advise [sic] was that we don't recommend that he get paid and we make that very, very clear to him and at the same time we don't deprive him of the opportunity. We allow him to make the argument to the Judge and we don't forfeit the assets in advance so that he can't make the argument to the Judge.

AUSA McGee also testified that the United States Attorney, P. Michael Patterson, expressed agreement with this position and asked AUSA McGee to communicate the above government position to plaintiff, including the difficulties, and AUSA McGee did so. During his deposition, which was admitted into the record, United States Attorney Patterson's recollection was that:

> I wanted to make it absolutely clear that the government was not going to be involved in setting an amount or to be involved in whether or not there was an amount of attorneys' fees or any other remuneration flowing to Mr. Bailey, and I wanted it made absolutely clear to Mr. Bailey that we were going to play no part in that, that he would would [sic] have to look to the court for that aspect of the case, and I asked Mr. McGee to specifically have a conversation with Mr. Bailey about that.

AUSA Kirwin testified that at the close of the meetings between the parties occurring on April 25–26, 1994, he believed that the Biochem Pharma stock would be transferred

to plaintiff to be used for the upkeep of the overseas drug related assets:

> [I]t was to be used for whatever costs of the defense that would come up. I don't know what specifically would come up, but that and also that it would be used as a source for whatever attorney's fees Judge Paul [9] deemed were reasonable at the end of the case. And then that, the remainder would come to the United States, would be forfeited to the United States.

On May 4, 1994 plaintiff and AUSA McGee met with Chief Judge Paul. Mr. Bailey advised that there probably would not be a trial in the *Duboc* case, and indicated that Mr. Duboc's cooperation "would be something way out of the ordinary." The same theme was contained in a letter dated May 4, 1994, from plaintiff to Mr. Duboc, in which plaintiff stated that: "We are attempting to break new ground in your case, and the key word here is *extraordinary.*" (Emphasis in original.) Mr. Bailey continued: "[Y]ou could give your *complete and immediate* cooperation, and stand an excellent chance of being well-rewarded with respect to your ultimate sentence of confinement." (Emphasis in original.) Plaintiff included in his memorandum to Mr. Duboc a footnote, which stated: "As I told you, and as AUSA Dave McGee has confirmed to you in my presence, it is the position of the *government* that any fees taken from forfeitable assets will be brought to the attention of Judge Paul, and that fees which appear to be *reasonable* will not be attacked." (Emphasis in original.)

On May 9, 1994, the Biochem Pharma stock was electronically transferred to plaintiff's Swiss account. Mr. Duboc had prepared a hand written draft of the transfer document, which was typed by United States Attorney's Office personnel, then signed by Mr. Duboc. Mr. Duboc subsequently called to confirm the electronic transfer of the stock into plaintiff's Swiss bank account. Plaintiff's Swiss bank computed the stock to be worth $5,891,352.00 at the time of the transfer.

On May 17, 1994, prior to Mr. Duboc's plea hearing before Chief Judge Paul, a conference was held in chambers. No transcript of the conference is available, however, those at the conference included United States Attorney Patterson, government attorneys Miller, Atchison and Kirwin, Agent Lilley, and Duboc attorneys Bailey and Shohat. Mr. Duboc was not present. According to AUSA Miller's recollection, during the conference Mr. Bailey explained to Chief Judge Paul:

> [T]hat he [Mr. Bailey] had been given and had trust of stocks his client had transferred to him; that those stocks were going to be used as needed and sold as needed to pay off expense incurred in the management of two huge French properties that were not in our custody yet; that there was expected to be a large amount of that money left over, and that the government had consented that at the conclusion of the case, based upon the Judge's determination of reasonableness, that that pool of money and the pool of stocks, whatever was left, could be made available for the payment of reasonable attorney's fees totally at the discretion of Judge Paul.
>
> And that was something that when Mr. Bailey finished saying that, I [AUSA Miller] concurred with everything he [Mr. Bailey] had said. It was a complete and fair assessment of what we had discussed previously.

AUSA Miller reiterated his own view that plaintiff's use of the stock was constrained:

> Q Now, is it true that Mr. Bailey had the right to sell all the stock the day after he got it if that's his decision?
>
> A No, that was not the understanding of what he told the court, what was said to the court and what counsel's understanding was, Mr. Shohat's understanding, my understanding, Mr. Duboc's understanding as to what he was to do with that stock. He wasn't to sell the entirety of the stock. He was only to liquidate the amount of the stock necessary for the upkeep of those properties and to maintain and hold the remaining corpus of that stock pool so that

9. Chief Judge Maurice M. Paul, United States District Court for the Northern District of Florida, to whom the criminal case against Claude

Duboc, Case No. GCR 94–01009, had been assigned.

it could continue to grow at the desire of his client, so that it could maximize his value and possible forfeitures to the United States.

Mr. Bailey testified that during the conference before Chief Judge Paul, he had indicated to the Chief Judge that he had received "six million dollars ... but that no fees had been taken from it .... There was no talk of shares, that I recall." Plaintiff also acknowledged during the conference that Chief Judge Paul would have ultimate approval of all fees at the end of the *Duboc* case, that plaintiff understood he would account for the $6 million value of the stock transferred to him, and present an application for payment of fees to Chief Judge Paul at the end of the case and not on an interim basis, although Mr. Bailey and Mr. Shohat agreed that under the arrangement they could take fees as they were necessary or earned. Mr. Bailey also testified that the term "trust" was not mentioned in the conference, as to the Biochem Pharma stock.

AUSA Kirwin, as noted above, attended the conference before Chief Judge Paul. His notes of the conference, which were introduced into evidence at the trial, and which were dated May 17, 1994, the same day as the conference, indicated that:

> Shohat wntd [sic] to have a portion of [Mr. Duboc's] Japanese stocks placed in trust in his [Mr. Shohat's] acct [sic]. GRM [AUSA Miller] informed him [Mr. Shohat] that wasn't acceptable, that the stocks held by Bailey [the Biochem Pharma stock] wld [sic] be sufficient. MMP [Chief Judge Paul] said that the arrangement [with] Bailey re: fees was sufficient. Bailey & Shohat will account for costs & reasonable fees to MMP who will have final say on fees.

Mr. Bailey indicated at trial that AUSA Kirwin's notes as to what occurred in Chief Judge Paul's chambers were "accurate all the way."[10] Mr. Bailey testified he expected that, "[w]hen we were all through, five, six years down the road, we would bring Judge Paul an accounting, tell him what feels had been gone down [sic], ask for any balance we thought was due."

AUSA Kirwin was asked at trial whether the discussion in the May 17, 1994 conference was of stocks being transferred to plaintiff, or funds being transferred to plaintiff. AUSA Kirwin's answer was that he wrote "stocks" in his notes, and would not have used that term if another term had been used at the conference. AUSA Kirwin's recollection was that Mr. Shohat was seeking the same type of agreement with the Japanese stock that plaintiff had with the Biochem Pharma stock. However, AUSA Kirwin did not remember hearing the use of the term "trust" as to the stock transferred to Mr. Bailey. AUSA Kirwin also did not remember AUSA Miller using the term "trust" with respect to the stock transferred to Mr. Bailey. Similarly, AUSA Atchison testified that he was not aware of anyone using the term "trust" to describe the stock transfer to plaintiff during the 1994—1995 time period.

Mr. Shohat, who was called to testify by the government, stated that he did not remember the term "trust" being used at the May 17, 1994 conference to describe the Biochem Pharma stock arrangements, but that he believed the plaintiff was holding the stock for the benefit of Mr. Duboc and the government, regardless of whether the word "trust" was used. In addition to the term "trust" surfacing in AUSA Kirwin's notes of the May 17, 1994, conference concerning the Japanese stock which Mr. Shohat unsuccessfully sought to have transferred, Mr. Shohat used the term "trust" in another unsuccessful attempt in a May 31, 1994 letter to AUSA Kirwin to have the Japanese stocks transferred "to an account I opened in trust for Mr. Duboc." Upon this initiative being rebuffed by AUSA Kirwin in a June 2, 1994 letter to Mr. Shohat, Mr. Shohat responded in a letter to AUSA Kirwin dated the same day, June 2, 1994, using the term "trust" again: "it appears that funds will not be available for the upkeep of the French properties until Lee Bailey completes arrangements for a loan against the Swiss trust account holding the BioPharm stock."

10. AUSA Kirwin also testified he believed that his notes represented a correct synopsis of the conference, which lasted, in his estimation, about fifteen minutes.

AUSA Kirwin testified that his understanding was, once the Biochem Pharma stock worth about $6 million had been transferred to plaintiff, plaintiff could have sold all of the stock at any time. According to AUSA Kirwin, plaintiff "had a particular series of things to accomplish with that [the Biochem Pharma stock] and however he could use the stock to accomplish what he needed to accomplish, I considered he could do that with the stock," although in the end, Mr. Bailey would have to account to Chief Judge Paul for what he did. AUSA Kirwin also understood that the stock was the only asset which would be provided to plaintiff for its intended purposes, overseas property expenses and attorneys' fees, since the other drug related assets would be forfeited, and, once forfeited, would be irretrievable. AUSA Kirwin also testified that no one ever said to him that if it [the stock] goes up, "it stays with Mr. Bailey," although AUSA Kirwin did testify that "what Mr. Miller expressed to me is that, you know, it [the stock] could go down, and he [Mr. Bailey] needs to be cautious."

On May 17, 1994, Mr. Duboc entered a guilty plea before Chief Judge Paul to the charges of conspiracy to import marijuana into the United States and conspiracy to launder drug proceeds. The accompanying plea agreement provided, among other things, that Mr. Duboc agreed to voluntarily forfeit all drug related assets. AUSA Kirwin testified during the trial of the case before this court that the Biochem Pharma stock was one of the drug related assets which Mr. Duboc agreed to forfeit to the United States. A case status report dated May 17, 1994, from AUSA Miller to the United States Attorney, P. Michael Patterson, lists among numerous forfeitable assets the account at the Union Bank Swiss, Luxembourg containing $3,500,000 in cash and $6,020,000 in stock ("BioChem in Canada, BioPharm/NY NASDAQ"). The plea agreement continued: "[Defendant Duboc] further agrees to assist the United States fully in the recovery and return to the United States of all such [drug related] assets ...." During the plea hearing, AUSA Miller stated: "The United States can point to, at the present time, approximately $100 million in assets that have been generated by this defendant, alone, and which the United States is in the process of attempting to repatriate back to the United States." The plea agreement was signed by Mr. Duboc, and his attorneys, Mr. Shohat and Mr. Bailey, and for the government by AUSA Miller as the Supervisory AUSA, Chief of Criminal Division, Northern District of Florida.

On May 19, 1994, P. Michael Patterson, the United States Attorney, wrote a memorandum to Mary Lee Warren, the Deputy Assistant Attorney General of the Criminal Division, United States Department of Justice (DOJ), in Washington, D.C., which stated:

[T]he government gave no promise or assurance of any kind in return for the [Duboc's] plea and that the government refused to agree to attorneys' fees out of arguably forfeitable assets. However, the government did agree that the District Court could set an amount of reasonable fees and that we would not seek forfeiture to the extent that the Judge determined the fees to be reasonable.

After the plea agreement was signed, AUSA Kirwin, Agent Lilley, Mr. Shohat and Mr. Bailey traveled to Europe to examine the drug related assets and review their marketability. On June 20, 1994, AUSA Kirwin wrote a letter to a potential purchaser of some of the drug related assets, stating, in part: "[Mr. Duboc] is represented by Mr. F. Lee Bailey and Mr. Edward Shohat, Attorneys at Law, both of whom are assisting Mr. DuBoc in carrying out his part of the plea agreement. By doing so they are both helping Mr. DuBoc carry out the terms of the agreement and assisting the United States in the location, liquidation and repatriation of DuBoc's drug related assets." AUSA Kirwin also sent a letter to the plaintiff, dated July 13, 1994, concerning the potential sale of two of Mr. Duboc's yachts and a boat slip, in which he stated: "The United States has sought the forfeiture of the above-listed items solely as a result of Mr. Duboc's criminal activities and I appreciate your efforts on behalf of Mr. Duboc to carry out the terms of his agreement vis-a-vis the liquidation of the items in question." In a memorandum to Mr. Duboc dated July 21, 1994, Mr. Bailey

characterized the level of cooperation with the government: "[T]he key word *extraordinary* is appropriate. In short, this kind of assistance in tidying up the aftermath of the seizure has never, to my knowledge, been made available to government attorneys by defense counsel in any prior cases. It is the kind of 'extra mile' which impresses Judge Paul." (Emphasis in original.)

In August, 1994, Mr. Bailey learned that French authorities had frozen certain accounts maintained by Mr. Duboc, as well as the bank accounts of Mr. Duboc's family, including accounts of those assisting in the upkeep of Mr. Duboc's overseas assets. Mr. Bailey requested that Chief Judge Paul issue a court order, in an attempt to protect the persons assisting the property maintenance efforts. He accompanied his request for a court order with an affidavit which stated that Mr. Duboc's plea agreement required him, through counsel, to repatriate drug related assets. Chief Judge Paul issued the requested Order on August 25, 1994. The language of the Order had been proposed by Mr. Bailey and coordinated with the United States Attorney's Office. The Order noted that a French Magistrate had commenced an investigation into the Duboc assets and that French authorities had blocked certain bank accounts and might initiate a competing claim against some of the assets. The Order further noted that Mr. Duboc's counsel and government counsel traveled to France "to implement the provisions of the plea agreement," and also named the individuals in France who had been assisting in the maintenance of the properties to carry out the terms of the plea agreement.[11]

In October, 1994, Mr. Bailey retained French counsel for assistance in the liquidation efforts. In an October 15, 1994 letter to the French attorney, he explained that:

I am in essence representing the United States as a "bridge" in an effort to carry out the terms of the plea agreement of Claude Duboc in the United States District Court for the Northern District of Florida. As a result of that agreement, Mr. Duboc

admitted to receiving certain monies as a result of importing marijuana and hashish from Pakistan to the United States, and agreed to forfeit all of the assets he acquired in the course of this enterprise to the United States, in compliance with its forfeiture laws.

Also in October, 1994, Mr. Bailey requested a letter from the United States Attorney's Office which would add to his authority to sell the French properties, in light of the seizures of bank accounts by French authorities. Mr. Bailey suggested that the letter of authority to him contain language which stated that:

as part of the plea agreement reached between your client and the United States, which became an order of the Court when Mr. Duboc's guilty plea was accepted last May 18, [1994,] you have obligated yourself to assist the United States in liquidating the assets forfeited to it by your client.

Language similar to that requested by plaintiff was contained in an October 18, 1994 letter from the United States Attorney's Office, signed by AUSA James C. Hankinson.

In a January 8, 1995 letter from Mr. Bailey to Mr. Duboc, which has been included by the parties as a jointly stipulated trial exhibit, plaintiff recounted that, in a conversation with co-counsel, a number of, to plaintiff, onerous conditions were raised. "I could have at this point rejected the silly conditions offered [by co-counsel], applied for a healthy fee to Chief Judge Paul, and turned the balance of the BioPhar stock back to the government.... Instead, I swallowed my tongue, and set about to produce for you [Mr. Duboc] the result I expected when we adopted our strategy in the first place." (Footnote omitted.) Later in the same January 8, 1995 letter, Mr. Bailey stated in a footnote that: "I will be paid—with Chief Judge Paul's approval—only that amount which is commensurate with the result achieved in your case, and the amount of work that went into it."

In a November 13, 1995 letter to Mr. Bailey, Mr. Duboc stated that he had retained other defense attorneys and that Mr.

---

11. Subsequently, it was agreed between France and the United States that the former would receive the returns from the forfeiture of selected personalty and the latter would receive the returns from the forfeiture of the remainder of the drug related assets, including the real estate.

Bailey's services as attorney of record were terminated. On December 1, 1995, AUSA Atchison called one of Mr. Bailey's associates and stated that, given the change of counsel and in light of the Biochem Pharma stock's increase in value, this would be a good time to liquidate the stock. The associate, Toni Kennedy O'Brien, conveyed the message to Mr. Bailey. Mr. Bailey's response to Ms. O'Brien was that he was entitled to the stock's appreciation, since he had taken the risk that the stock would depreciate in value.

On January 4, 1996, plaintiff wrote to Chief Judge Paul regarding the pending motion for substitution of counsel and upcoming hearing on the matter. The letter states, in part, "I have traveled to Gainesville and Tallahassee many, many times; to Los Angeles once, to Vancouver B.C. three times; and to Europe more than half a dozen times, all in an effort to assist him [Mr. Duboc] in carrying out his plea agreement with the United States in a manner which would one day be viewed as stunning, and an exemplar for others." At the hearing on the motion to substitute counsel, which was held on January 11, 1996, Mr. Bailey, through counsel, stated that he was entitled to the appreciation in the Biochem Pharma stock. At the trial in this case, AUSA Kirwin testified he heard for the first time at the hearing to substitute counsel on January 11, [1996,] that "Mr. Bailey's position was the stocks belonged to him." Chief Judge Paul issued an Order, dated January 12, 1996, which relieved Mr. Bailey as the attorney of record for Mr. Duboc, froze the drug related assets in Mr. Bailey's possession, retained jurisdiction over Mr. Bailey in order to obtain from him a full accounting and specifically directed Mr. Bailey to deliver to the court an accounting of the drug related assets, including the 602,000 shares of Biochem Pharma stock. The court also retained jurisdiction over Mr. Bailey to review the plaintiff's submission of a request for attorney's fees and to award such fees, if appropriate. After he was discharged as attorney of record, plaintiff offered to remain as the liquidator of the overseas drug related assets, but the government declined the offer. AUSA Kirwin sent plaintiff a letter dated January 25, 1996, indicating that plaintiff's services were no longer required for the maintenance, liquidation and repatriation of the French properties.

Regarding a January 19, 1996 meeting, which included, among others, Mr. Bailey, AUSA Miller and AUSA Kirwin, the government's position was described as always having been that the Biochem Pharma stock was held by the plaintiff in trust. According to the testimony of Mr. Bailey's former associate Toni Kennedy O'Brien, AUSA Miller asserted that Mr. Duboc remembered a "trust." Also according to Ms. O'Brien, plaintiff's position at the meeting was that this was the first time he, Bailey, had heard of a trust, and that he was only required to account to the government for the approximately $5.8 million value of the Biochem Pharma stock at the time of the transfer of the stock to his account, not for the subsequent appreciation of the stock in value. AUSA Kirwin testified that, "obviously we had not seen eye to eye on what the agreement was." At the January 19, 1996 meeting, plaintiff made available to the government cost information and supporting invoices relating to the representation of Mr. Duboc, including expenses for the maintenance and repatriation of the overseas drug related assets.

In a January 21, 1996 letter to Chief Judge Paul, plaintiff referenced the January 19, 1996 meeting with government counsel, and, addressing the differing views, stated:

> The problem is neither complex nor very difficult, but it is probably unique in some respects. The issue presented is this: Did the language or conduct of the parties— Mr. Miller and myself, since no one else was privy to our conversation—create a trust of some sort on April 26, 1994, and if so what were its terms? The answer is that the terms of "the deal" were simple and I intend and have always intended to honor them.
>
> \* \* \* \* \* \*
>
> I agreed to materially assist in any way that I could in liquidating these properties, and returning the proceeds to the United States, as I have in fact done on several occasions. Mr. Miller then said that his office wanted to see that I was protected

on fees and expenses, including those expenses related to the proposed liquidation efforts, and that he was prepared to transfer to my use a portion of the forfeited assets. I agreed.

\* \* \* \* \* \*

He [AUSA Miller] pointed out that since I had chosen to accept the stock, I would have to be mindful of the fact that all of the downside risk was mine. In other words, if I chose to hold onto it and it went down, as far as he was concerned the loss was mine and no part of it could be attributed to the government. I was entitled to protect myself in any way I saw fit, including a sale of all or a part of the shares. Once again I agreed. There was no talk whatsoever about the government participating in any appreciation of the value of the stock should I choose to risk holding all or part of it.

Later on that same day, First Assistant Dave McGee asked me to sit with himself and others on his staff for a point of clarification. It seemed to me that in a discussion with his colleagues, concern had been expressed that the government had apparently agreed to an unconditional transfer of the value of the stock to me. Mr. McGee explained to me that the government was not in the business of deciding the *amount* of fees to be paid to a defense lawyer,[12] and that approval of any claimed fees would ultimately be up to Your Honor. I replied that this was a reasonable condition, and that I would carefully account for the money, and submit an ultimate accounting. There was no discussion of any periodic or interim accounting, and absolutely no talk of the government's participation in any gain or loss in the value of the stock.

\* \* \* \* \* \*

When Mr. Shohat entered the picture, he demanded that I give him "half the money" as co-counsel. I told him that I had no authority to do that, since I had in principle agreed to hold the funds in the nature of a trust, with final approval for legal fees to be approved by Your Honor.

\* \* \* \* . \* \*

On the morning of Mr. Duboc's plea tender to the Court, we met in chambers.... *I* interjected that the payment of fees was to be ultimately approved by Your Honor .... There was *no* discussion as to any trust in which the government and I had any sort of joint interest other than "six million dollars."

On May 9, 1994, 602,000 shares of Biochem shares were delivered to my personal account in Geneva. They were not delivered to this account with any notation that they were impressed with a trust. Their value on that date as calculated by the bank was $US 5,891,352.00. I viewed that as money held by me as an account in which the United States had an interest, to this extent: after the payment of costs associated with the case, and fees approved by Your Honor, any balance of the $5,891,352.00 remaining would revert to the United States.

(Emphasis in original.) Mr. Bailey indicated in his letter to Chief Judge Paul that he viewed himself as accountable for the dollar value of the stock received at the time of transfer, $5,891,352.00, and not for the stock shares.

On January 22, 1996, the United States Attorney's Office filed a motion for the surrender of forfeitable property transferred to Mr. Bailey, specifically naming the 602,000 shares of Biochem Pharma stock. On January 25, 1996, Chief Judge Paul issued an Order for Mr. Bailey to appear before the court with the Biochem Pharma stock and stock proceeds, and with a full accounting of the drug related assets and their disposition. On February 3, 1996, the District Court entered an Order holding Mr. Bailey in civil contempt, and providing that Mr. Bailey could purge himself of contempt by producing the "requested documents, accountings,

---

12. At this point in plaintiff's January 21, 1996 letter, a footnote was inserted, which stated: "During a dinner meeting between myself, Mr. Miller, Mr. Kirwin, Mr. Atkinson, Mr. Lilley and Robert Shapiro on the evening of April 16, 1994, Mr. Shapiro asked if the government representatives thought a million dollars would be a fair fee. Mr. Lilley said that it would, and the others nodded."

and the stocks," and repaying into the registry of the court monies drawn for expenses and attorney's fees. Mr. Bailey did not comply immediately with the District Court's orders, and was imprisoned for forty-four days as a result. After the District Court determined that Mr. Bailey had substantially complied with the court's orders, he was released, by a court Order dated April 19, 1996.

On March 22, 1996, the District Court entered a Stipulated Order of Forfeiture of the 602,000 shares of Biochem Pharma stock pursuant to 21 U.S.C. § 853(a)(1). The Stipulated Order of Forfeiture dated March 22, 1996, specifically provided for the consideration of any third party claims to the stock, pursuant to 21 U.S.C. § 853(n). In the District Court's May 17, 1996 Final Order of Forfeiture, the court stated that plaintiff had filed a petition pursuant to 21 U.S.C. § 853(n)(2) [13] on April 23, 1996, then had withdrawn the petition, with prejudice, on May 17, 1996. The District Court, in a companion Order to the Final Order of Forfeiture on May 17, 1996, stated that:

> Now, by filing of the "Stipulation for Dismissal with Prejudice," Mr. Bailey has withdrawn his right to pursue his claim for the stocks, or the proceeds thereof; he is hereafter estopped from asserting such claim now or in the future, not only in this forum, but in any other forum.... [T]he United States of America is determined to be the fee simple owner of all the assets that formed the *res* of the subject forfeiture action ... free and clear from all claim of right, title, or interest [of the plaintiff].

The United States sold the remaining shares of Biochem Pharma stock, for total net proceeds of $15,681,205.00, after commissions.

The District Court stated that the withdrawal of the section 853(n) claim did not operate to forfeit plaintiff's right to make a claim for attorney's fees and expenses for the representation of Mr. Duboc. Plaintiff did not seek compensation for attorney's fees for himself, although he did seek compensation for other counsel. He did claim expenses in the amount of $1,585,690.22, including for transportation, lodging, medical expenses for Mr. Duboc, telephone, Federal Express, and photocopying, and over $1.1 million for the management of the European assets. Expenses in the amount of $1,221,177.06 were approved by the District Court. The District Court also stated: "Since the shares of stock which were sold by Bailey constituted an asset which was forfeitable to the United States under this nation's drug laws, the profit that was derived from their sale was and is the United States Government's. It never was, nor is it now, Bailey's profit to do with as he pleases." On appeal to the United States Court of Appeals for the Eleventh Circuit, the expenses claimed and awarded by the District Court were affirmed, except for one $1,013.29 item, which was remanded to the District Court for reconsideration. *United States v. Bailey*, 175 F.3d 966, 970 (11th Cir.), *reh'g and reh'g en banc denied*, 192 F.3d 132 (1999) (table).

On December 30, 1998, Mr. Duboc was sentenced to life imprisonment on the charge of conspiracy to import marijuana, was sentenced to 240 months on the charge of conspiracy to commit money laundering, was fined $5 million and forfeited approximately $100 million in drug related assets. Subsequently, Mr. Duboc moved to withdraw his guilty plea, the District Court denied the motion, and Mr. Duboc appealed on the grounds that Mr. Bailey had rendered ineffective assistance of counsel due to a conflict of interest associated with the Biochem Pharma stock. The United States Court of Appeals for the Eleventh Circuit remanded, asking the District Court whether "Bailey intended to claim the appreciation of the stock as his own prior to DuBoc's entering his guilty plea in this case." *United States v. Duboc*, No. 99–2215, 2000 WL 1872100 (11th

---

13.

§ 853(n)(2) Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury. 21 U.S.C. § 853(n)(2).

Cir. Nov.21, 2000) (per curiam). On remand, the District Court determined that: "Although the parties involved have since disputed the precise nature of the transfer to Mr. Bailey, they do not dispute the timing of when Mr. Bailey first became aware of the stock." *United States v. Duboc*, No. 1 94cr9 MMP, Order at 3 (N.D.Fla. May 18, 2001). Mr. Duboc committed to pleading guilty and providing extraordinary cooperation to the government, on advice of Mr. Bailey, before Mr. Bailey learned of the stock's existence and before Mr. Duboc had advised that the stock might appreciate in value. The District Court concluded that Mr. Bailey did not possess a conflict of interest at the time Mr. Duboc decided to enter a guilty plea, and that the guilty plea, therefore, was not the result of ineffective assistance of counsel. *United States v. Duboc*, No. 1 94cr9 MMP, Order at 5 (N.D.Fla. May 18, 2001).

## DISCUSSION

### I. *Jurisdiction*

*Res Judicata*

As a threshold matter, defendant has renewed its challenge to the jurisdiction of the court based on the doctrine of *res judicata*. Defendant does not appear to have altered the essence of its argument, but has offered a restatement on the issue. *See Bailey v. United States*, 40 Fed.Cl. at 460–61 and *Bailey v. United States*, 46 Fed.Cl. at 202–09, 212. Reviewing defendant's arguments, after further briefing, has not caused the court to change its view of the inapplicability, under these facts, of the *res judicata* bar. The basis for the court's conclusion is summarized below.

 The doctrine of *res judicata*, or claim preclusion, provides that "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979);

*see also Young Eng'rs, Inc. v. United States Int'l Trade Comm'n*, 721 F.2d 1305, 1313–17 (Fed.Cir.1983) (discussing the principles of *res judicata*). The elements of *res judicata* are as follows: "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed.Cir.2000) (citations omitted). The doctrine of *res judicata* also provides, as a prerequisite, that a "full and fair opportunity to litigate" claims has occurred. *Poyner v. Murray*, 508 U.S. 931, 933, 113 S.Ct. 2397, 124 L.Ed.2d 299 (1993) (quoting *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). In the present case, Mr. Bailey dismissed a claim filed in federal District Court, with prejudice, and filed the present claim in the Court of Federal Claims. Under those circumstances, the parties dispute whether, for purposes of *res judicata*, there was a final judgment on the merits, thereby barring the second claim.

 On April 23, 1996, Mr. Bailey filed a "Petition and Response to Stipulated Order of Forfeiture and Notice Thereof" in District Court, asserting an interest in the Biochem Pharma stock, but objecting to adjudication of his interest in a section 853(n) criminal forfeiture proceeding. In a May 17, 1996 hearing before the District Court, Mr. Bailey's counsel stated that Mr. Bailey's claim should properly be brought in the Court of Federal Claims, a view which earlier had been articulated by AUSA McGee.[14] At the May 17, 1996 hearing, counsel for Mr. Bailey offered the court a stipulation, signed also by AUSA McGee, stipulating to the dismissal of his claim in the section 853(n) criminal forfeiture proceeding, with prejudice. Plaintiff then brought a breach of contract claim exceeding $10,000.00 in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (1994). Jurisdictionally, a breach of

14. In a May 3, 1996 pleading titled "Government's Motion to Dismiss Third–Party Petition and Stay Discovery and Incorporated Memorandum of Law," filed in District Court by First Assistant AUSA McGee on behalf of the United States, the government stated: "If Bailey believes that he has a cause of action based on contract, he has a right to file a lawsuit in the Court of Claims [sic]."

contract claim exceeding $10,000.00 could not have been brought in federal district court. United States District Courts possess concurrent jurisdiction with the United States Court of Federal Claims for claims founded upon express or implied-in-fact contracts with the United States, not exceeding $10,000.00. 28 U.S.C. § 1346 (2000). The Court of Federal Claims possesses "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States," regardless of the amount at issue. 28 U.S.C. § 1491(a)(1) (Tucker Act). Plaintiff's claim exceeded the federal district court's jurisdictional ceiling for a breach of contract action.

Defendant argues that: "[T]he district court possessed authority, not only pursuant to 21 U.S.C. § 853, but also pursuant to its inherent authority to adjudicate the alleged contract, and did so. Consequently, *res judicata* must apply." Without distinguishing between a breach of contract action and section 853(n) forfeiture proceeding, the defendant relies on *Phoenix Petroleum* for the proposition that: " 'A voluntary dismissal with prejudice is considered a final judgment on the merits for purposes of *res judicata*.' " *Phoenix Petroleum Co. v. United States*, 40 Fed.Cl. 862, 867 (1998), *rev'd*, 215 F.3d 1345, 1999 WL 521189 (Fed.Cir.1999) (table) (citing *Chromalloy Am. Corp. v. Kenneth Gordon, Ltd.*, 736 F.2d 694, 697 (Fed.Cir.1984); *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n*, 721 F.2d at 1314; *Mosely v. United States*, 15 Cl.Ct. 193, 194 (1988)). As the court noted in its last opinion, however, the doctrine of *res judicata* did not operate to bar the subsequent proceedings in any of the above cases. *See Bailey v. United States*, 46 Fed.Cl. at 205; *see also Phoenix Petroleum Co. v. United States*, 215 F.3d 1345, 1999 WL 521189 (Fed.Cir.1999) (table) (reversing the conclusion of the Court of Federal Claims that suit was barred by *res judicata* ); *Chromalloy Am. Corp. v. Kenneth Gordon, Ltd.*, 736 F.2d at 697 (reversing a conclusion that the claim was barred by *res judicata*, since the same claim was not being relitigated); *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n*, 721 F.2d at 1316–17 (affirming a conclusion that the

claim was not barred by *res judicata*, since the same claim was not being relitigated); *Mosely v. United States*, 15 Cl.Ct. at 197 (finding that plaintiff's suit was not barred because the issue raised was on a different legal theory, sought different relief and could not have been raised in the prior litigation).

The defendant also cites *Mintzmyer v. Department of Interior*, 84 F.3d 419, 423 (Fed. Cir.1996) and *MGA, Inc. v. General Motors Corp.*, 827 F.2d 729, 731 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1009, 108 S.Ct. 705, 98 L.Ed.2d 656 (1988). In *Mintzmyer*, the United States Court of Appeals for the Federal Circuit determined that the claimant was collaterally estopped from bringing a claim before the Merit Systems Protection Board, after a district court had previously litigated the very issue plaintiff sought to relitigate before the MSPB. *Mintzmyer v. Dep't of Interior*, 84 F.3d at 423. In the *MGA* case, a patent infringement claim was brought in state court, which applied federal law and found against MGA. The Federal Circuit determined that a subsequent suit in federal district court was precluded by the doctrine of *res judicata*. *MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d at 731–32. "In this case, MGA selected its first defendant, first forum and first remedy. MGA had its day in court with a full trial on the merits of its case." *Id.* at 735. In both of these cases, the claims were actually litigated, and resolved, although not to the satisfaction of the claimants, prior to being brought in subsequent fora. Although defendant argues that Mr. Bailey is similar to the claimants in those two Federal Circuit cases, in that plaintiff dismissed his claim before the District Court, with prejudice, and the voluntary dismissal was a final judgment on the merits for purposes of *res judicata* precluding subsequent litigation of the claim in the Court of Federal Claims, the application of these two cases depends on whether plaintiff's breach of contract claim and plaintiff's forfeiture claim can be considered the same, and whether plaintiff's breach of contract claim can be litigated in District Court.

The United States Court of Appeals for the Federal Circuit opinion in *Young Engineers*, cited by defendant, and cited by the

court in *Phoenix Petroleum,* is most instructive, but not for the defendant's conclusion that Mr. Bailey's voluntary dismissal of his section 853(n) petition in District Court was a judgment on the merits and, therefore, bars his breach of contract claim in this court on the grounds of *res judicata.* The Federal Circuit in *Young Engineers* relied on the Restatement (Second) of Judgments, which provides that:

> (1) When any of the following circumstances exists, the [general rule of section 24 on bars including *res judicata* ] does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts
> . . . .

Restatement (Second) of Judgments § 26 (1982). *See, generally, Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d at 1314. The Restatement also explains the policy behind this principle:

> The general rule of § 24 is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to a court in one action the entire claim *including any theories of recovery* or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.

Restatement (Second) of Judgments § 26 comment c (1982); *see also Bio–Technology Gen. Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1563–64 (Fed.Cir.1996) (citing the Restatement (Second) of Judgments § 26(1)(c) comment c, quoted above, and finding against claim preclusion), *cert. denied,* 519 U.S. 911,

117 S.Ct. 274, 136 L.Ed.2d 197 (1996); *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d at 1315.

Another application of the Restatement (Second) of Judgments rule quoted above is found in the case of *Golden Pacific Bancorp v. United States,* in which the United States Court of Appeals for the Federal Circuit stated that:

> [T]he taking claim could not have been litigated, in the district court action, in view of the fact that the district court lacked subject matter jurisdiction over Golden Pacific's taking claim because it was a non-tort monetary claim exceeding $10,000. Accordingly, Golden Pacific's taking claim is not barred by the doctrine of *res judicata* because the suit before the Claims Court was not based upon the same claim as the suit before the district court.

*Golden Pacific Bancorp v. United States,* 15 F.3d 1066, 1071 (Fed.Cir.) (citation omitted), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *see also Martin v. United States,* 30 Fed.Cl. 542, 546 (1994) ("In this court, Martin seeks a Tucker Act remedy which was unavailable to him in the earlier district court lawsuit; consequently, the cause of action presently in this court is dissimilar and *res judicata* cannot apply."), *aff'd,* 41 F.3d 1519, 1994 WL 623212 (Fed. Cir.1994). Similarly, Mr. Bailey seeks a Tucker Act, breach of contract remedy unavailable to him in district court. 28 U.S.C. § 1491(a)(1).

The Federal Circuit's complete statement of the rule in *Young Engineers* was that *res judicata* "may apply even though a judgment results by default, consent, or dismissal with prejudice although care must be taken to insure the fairness in doing so." *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d at 1314 (emphasis added) (citing 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §§ 4419, 4442, 4443 (1981)); *see also Montana v. United States,* 440 U.S. at 153–54, 99 S.Ct. 970 ("To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation at-

tending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.") (emphasis added). The Supreme Court's caveat in *Montana* and the Federal Circuit's caveat in *Young Engineers* raise the issue of whether it is fair to give *res judicata* effect to Mr. Bailey's withdrawal, with prejudice, of his third party section 853(n) petition in the Tucker Act breach of contract action before this court, an action unavailable to plaintiff in District Court. *See* 28 U.S.C. § 1491(a)(1).

Section 853(n) provides a claimant who possesses a prior interest in property—predating the illegal activity which caused the property to be forfeitable—with a claims procedure in federal district court to vindicate that prior interest. A second ground for recovery under section 853(n) is designed for the innocent purchaser for value, who was without knowledge at the time of purchase that the property was forfeitable due to its illegal character. The language of the statute limits third party claimants to these two bases for recovery.[15]

Under the third party claim procedures of the criminal forfeiture process, Mr. Bailey was limited to arguing that he had an interest in the Biochem Pharma stock prior to the stock's illegal drug origins, or that he was an innocent purchaser for value of the stock. Defendant's argument rejects Mr. Bailey's claim as a contract action. Rather, defendant attempts to force what plaintiff identifies as a contract claim exceeding $10,000.00 into the limited ambit of section 853(n).

Neither party to this case suggests that Mr. Bailey had an interest in the Biochem Pharma stock or even knew of the stock prior to the stock becoming identified as one of Mr. Duboc's drug related assets. As to whether a criminal defense attorney could ever be "reasonably without cause to believe that the property [drug related assets] was subject to forfeiture," 21 U.S.C. § 853(n)(6)(B), the United States Supreme Court has noted that: "[G]iven the requirement that any assets which the Government wishes to have forfeited must be specified in the indictment, see Fed. Rule Crim. Proc. 7(c)(2), the only way a lawyer could be a beneficiary of § 853(n)(6)(B) would be to fail to read the indictment of his client." *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 632 n. 10, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).[16] The dissent in *Caplin & Drysdale* concurred with the majority in this regard:

> Under § 853(c), a third-party transferee may keep assets if he was "reasonably without cause to believe that the property was subject to forfeiture." Most legitimate providers of services will meet the requirements for this statutory exemption. The exception is the defendant's attorney, who cannot do his job (or at least cannot do his job well) without asking questions that will reveal the source of the defendant's assets.

*Caplin & Drysdale, Chartered v. United States,* 491 U.S. at 655 109 S.Ct. 2646 (Blackmun, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.); *see also United States v. Monsanto,* 491 U.S. 600, 604 n. 3, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) ("[I]t is highly doubtful that one who defends a client in a criminal case that results in forfeiture could prove that he was 'without cause

---

15. § 853(n) Third party interests

 * * * * * *

(6) If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section; the court shall amend the order of forfeiture in accordance with its determination.
21 U.S.C. § 853(n)(6)(A) and (B).

16. The majority included Justice White who delivered the opinion of the court, in which Chief Justice Rehnquist and Justices O'Connor, Scalia and Kennedy joined.

to believe that the property was subject to forfeiture.' "); *United States v. Michelle's Lounge,* 39 F.3d 684, 694 n. 7 (7th Cir.1994) ("Criminal forfeiture provisions exempt third party purchasers for value who are 'reasonably without cause to believe that the property was subject to forfeiture under this section.' 21 U.S.C. § 853(c).... But since an indictment or complaint is notice that the property is subject to forfeiture, attorneys cannot avail themselves of the exemptions.").

In *United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660, 663–64 (4th Cir. 1996), *cert. denied,* 519 U.S. 1101, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997), a law firm received drug related assets in the form of cash from a client as a legal fee. The law firm claimed that it was reasonably without cause to believe that the property was subject to forfeiture, and was an innocent transferee under 21 U.S.C. § 853(n)(6)(B). *Id.* at 665. The Court of Appeals affirmed the district court finding against the law firm:

> Both what the law firm knew in August, 1991, and what it declined to inquire about, convinces us that it reasonably had cause to know that the $103,800 was subject to forfeiture, and thus its § 853(n)(6) petition was properly rejected.

> \* \* \* \* \* \*

> It is true that the CFA [Comprehensive Forfeiture Act of 1984, 21 U.S.C. § 853] recognizes and protects the interests of third-party transferees. The extent of that protection, however, is spelled out in § 853(n), which prevents the forfeiture of assets held by innocent third parties. The law firm was given the full benefit of this provision, but it failed utterly to demonstrate that it was an innocent transferee.

*United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d at 666, 669; *cf. United States v. Saccoccia,* 165 F.Supp.2d 103, 111–12 (D.R.I.2001) (in considering whether defense attorneys were bona fide purchasers for value under the Racketeer Influenced and Corrupt Organizations Act (RICO) statute, 18 U.S.C. § 1963(c), a federal district court found that, before their clients' convictions, defense attorneys did not have reasonable cause to believe that the fees paid to them came from the proceeds of money laundering activity, but after the convictions, the defense attorneys had cause to believe that their clients were guilty and that the fees came from illegal activity).

Defendant also cites the court to a United States Court of Appeals for the Federal Circuit case, *Vereda, Ltda. v. United States,* 271 F.3d 1367 (Fed.Cir.2001), in support of its contention that the Court of Federal Claims is without jurisdiction over Mr. Bailey's contract claims. However, *Vereda* is distinguishable from the present case. In *Vereda,* an aircraft used to transport illegal drugs was seized and administratively forfeited to the United States by the DEA, pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. § 881(a)(4) (1999) (providing that all conveyances, including aircraft, used to transport controlled substances are subject to forfeiture). *Id.* at 1370. Vereda held a mortgage on the aircraft to secure payment, but failed to file a timely claim of its interest with the DEA, in fact, Vereda filed no claim with either the DEA or in federal district court. *Id.* at 1370, 1372. Instead, Vereda filed a taking claim in the Court of Federal Claims, which certified an interlocutory appeal to the Federal Circuit: "[w]hether a mortgagee [Vereda] may assert a viable Fifth Amendment taking claim in the United States Court of Federal Claims following the government's *in rem* administrative forfeiture of the property securing the mortgage after proceedings in the United States District Court." *Id.* at 1369 (quoting *Vereda, Ltda. v. United States,* 46 Fed.Cl. 569, 570 (2000)). The Federal Circuit answered the certified question in the negative, concluding that the Court of Federal Claims was not given authority under the Controlled Substances Act to determine the correctness of the administrative forfeiture, including whether Vereda's mortgage interest should be forfeited. *Id.* at 1374–75. Under the Controlled Substances Act, administrative review of the forfeiture action is by the DEA, and judicial review is by a federal district court. *Id.* at 1375. The Federal Circuit concluded:

> [T]he Court of Federal Claims does not have authority to determine whether the airplane as a whole, which includes Vere-

da's interest in the airplane, met the criteria for forfeiture .... Congress created a statutory scheme that provides a claimant such as Vereda with the ability to challenge the merits of an *in rem* forfeiture, both administratively and before a district court.... The Court of Federal Claims "does not have jurisdiction to review the decisions of district courts." *Joshua v. United States,* 17 F.3d 378, 380 (Fed.Cir. 1994). This means that the Court of Federal Claims cannot entertain a taking claim that requires the court to "scrutinize the action of" another tribunal. *Allustiarte v. United States,* 256 F.3d 1349, 1352 (Fed. Cir.2001) (holding that the Court of Federal Claims lacked jurisdiction to adjudicate a taking claim based on "an allegedly improper action by a bankruptcy trustee that was approved by a Ninth Circuit bankruptcy court").

*Vereda, Ltda. v. United States,* 271 F.3d at 1375; *see also Innovair Aviation, Ltd. v. United States,* 51 Fed.Cl. 569, at 569 (2002) (a case in which the Court of Federal Claims was asked to review a district court decision as to the value of the property at issue.).

In contrast with *Vereda,* this court is not attempting to scrutinize any part of the District Court forfeiture action against drug related assets by the federal district court. Nor is it reviewing a taking claim brought by a plaintiff. In the present case, Mr. Bailey does not challenge the federal district court's *in rem* forfeiture procedures, nor could he, for third party challenges require claimants to be prior owners of the drug related assets or innocent purchasers for value. Mr. Bailey is neither, and his contract claim in this court does not rely on either prior ownership or subsequent innocent purchase of Biochem Pharma stock. Instead, plaintiff alleges a breach of contract in excess of $10,000.00, which, if he has properly characterized the claim, is reviewable only in the Court of Federal Claims. Unlike Mr. Bailey, the claimant in *Vereda* possessed a mortgage

interest in the aircraft, predating the basis for the forfeiture of the aircraft, an illegal drug smuggling charge, which could have been fully vindicated in the forfeiture process. The claimant in *Vereda* did not make a timely administrative or federal district court claim in the forfeiture proceedings. Under these facts and circumstances, Vereda's taking claim in the Court of Federal Claims to vindicate the claimant's mortgage in the aircraft was not permitted.

In the present case, plaintiff alleges an independent contract claim exceeding the jurisdictional ceiling in federal district court. Plaintiff's complaint is based on an alleged independent contract entered into with government officials to assist in the repatriation of Mr. Duboc's assets. Mr. Bailey, who had no interest in the Biochem Pharma stock prior to his client's illegal drug activity, 21 U.S.C. § 853(n)(6)(A), and aware that the Biochem Pharma stock was subject to forfeiture pursuant to 21 U.S.C. § 853 prior to the time it was electronically transferred into his account to help in the repatriation of assets effort, seeks to bring a contract action in this court pursuant to the Tucker Act. The stock at issue was chosen as a means of funding from among several sources identified for such payment. Moreover, although the stock at issue was ultimately subjected to forfeiture by the government, initially it was transferred to plaintiff for use in the repatriation efforts when arrangements were made to obtain Mr. Bailey's assistance.[17] Given the circumscribed ambit of section 853(n), and the fact that breach of contract actions against the government in excess of $10,000.00 cannot be brought in federal district court, Mr. Bailey would not have had, in the words of the United States Supreme Court, a "full and fair opportunity" to litigate a contract claim under the section 853(n) forfeiture procedures in the District Court. *See Poyner v. Murray,* 508 U.S. at 933, 113 S.Ct. 2397; *Montana v. United States,* 440 U.S. at 153, 99 S.Ct. 970. Therefore, *res*

---

17. Plaintiff argues that:

If the government's position were correct, any liquidator who suffered damages from breach of a government contract must sue in District Court if the contract involves liquidation of assets seized in a forfeiture action. Under the

government's theory, if a real estate management company contracted with the U.S. Marshall's [sic] Service to manage an office building seized in a forfeiture case, the company would have to bring its breach of contract action in District Court.

*judicata* effect should not be given to plaintiff's withdrawal, with prejudice, of his petition pursuant to the forfeiture statute, prior to adjudication in District Court. *See also Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d at 1314 ("care must be taken to insure the fairness," before using *res judicata* to bar a claim previously dismissed with prejudice). The task for this court is not to review the forfeiture proceedings, but rather to determine whether the government entered into a separate contractual arrangement with the plaintiff, and if so, the nature of that arrangement.

A plaintiff is only required to adequately plead the existence of a contract in order to invoke jurisdiction under the Tucker Act. *See Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *Moore v. United States,* 48 Fed.Cl. 394, 398 (2000), *appeal dismissed,* 17 Fed.Appx. 973 (Fed. Cir.2001); *McAfee v. United States,* 46 Fed. Cl. 428, 432, *appeal dismissed,* 250 F.3d 762, 2000 WL 992035 (Fed.Cir.2000). This, the plaintiff has done. Accordingly, the court finds Tucker Act jurisdiction appropriate in this court in order to afford the plaintiff an opportunity to be heard on his breach of contract claim. The United States Court of Appeals for the Federal Circuit in *Kearns v. General Motors Corp.* stated: "[P]recedent weighs heavily against denying litigants a day in court unless there is a clear and persuasive basis for the denial." *Kearns v. Gen. Motors Corp.,* 94 F.3d 1553, 1557 (Fed. Cir.1996), *cert. denied,* 520 U.S. 1186, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997). Defendant's motion to dismiss is rejected.

*Criminal Justice Cooperation Agreements*

■ Defendant also contends in post-trial briefings that plaintiff's claim is based on an agreement, arising in the context of a criminal justice proceeding, by virtue of which district courts possess "inherent authority to adjudicate the alleged contract." Defendant argues that: "The Court [of Federal Claims] previously has held that a 'cooperation agreement' is 'a creation of the criminal justice system .... [T]his Court is ill-suited to manage the different purposes and different motivations that such criminal agreements serve.'" *Doe v. United States,* 37 Fed.Cl. 74,

78 (1996) (quoting *Drakes v. United States,* 28 Fed.Cl. 190, 194 (1993)). In the *Doe* case, the plaintiff claimed that the government breached an agreement to file a motion to reduce his sentence. The plaintiff in *Doe* had assisted the government in its investigations, resulting in the apprehension of federal fugitives. *Doe v. United States,* 37 Fed.Cl. at 75. Noting that a plea agreement in a criminal case is not a contract in the civil sense, the Court of Federal Claims dismissed the complaint: "In the criminal justice system, agreements entered into between the Government and a criminal defendant do not lend themselves to the same remedies that may be appropriate and necessary to provide complete relief to a contractually injured party who has entered into an agreement with the Government in its proprietary capacity." *Id.* at 78. The court quite properly suggested that the Court of Federal Claims should not become involved in the business of conducting criminal trials and that, therefore, Fed. R. of Crim. P. 35(b) cooperation agreements for reduction of sentences in return for substantial assistance are within the jurisdiction of the federal criminal courts, not this court. *Id.* at 78. Mr. Bailey, however, is not alleging the type of cooperative agreement found in the *Doe* case and discussed immediately above.

Similarly, in the *Drakes* case, the government specifically and in writing promised in a plea offer to protect the criminal defendant in return for his cooperation with the government in various criminal investigations. Threats were made to the defendant, and he requested release from jail for his protection, but was not released. After the defendant was injured while in jail, he was released. *Drakes v. United States,* 28 Fed.Cl. at 191. The alleged breach of the plea agreement was dismissed by the Court of Federal Claims, which found that the government was not liable for damages resulting from sovereign acts performed by it in its sovereign capacity and for which no waiver had been granted, and the plea agreement was a sovereign act. *See id.* at 193.

Defendant also cites the court to *Silva v. United States,* 51 Fed.Cl. 374, *aff'd,* 51 Fed. Appx. 12 (Fed.Cir.2002). In *Silva,* the gov-

ernment confiscated a number of exotic parrots. *Id.* at 375. Mr. Silva subsequently pled guilty to the illegal importation of protected wildlife, but claimed breach of a breeding agreement between Silva and a private individual who became an informant for the government, and who Silva alleged had entered into the contract on behalf of the government. *Id.* at 376. The *Silva* court found that assuming privity of contract with the government existed, which was by no means clear, the alleged agreement would have been for the purpose of an undercover law enforcement investigation of the illegal importation of wildlife. *Id.* at 377. Dismissing the complaint, the court held that: "[T]hese law enforcement operations are activities of the criminal justice system, activities that, without question, lie 'at the heart of sovereign action.' " *Id.* (quoting *Sadeghi v. United States,* 46 Fed.Cl. 660, 662, *appeal dismissed,* 250 F.3d 762, 2000 WL 991998 (Fed.Cir.2000) (table)).

The United States Court of Appeals for the Federal Circuit also has addressed this area of law in *Sanders v. United States,* 252 F.3d 1329, 1331 (Fed.Cir.2001), involving an alleged breach of an agreement with a criminal defendant concerning his release on bail after trial. The Circuit Court of Appeals agreed that alleged breaches of plea agreements, which are entirely concerned with the conduct of the parties in a criminal case, do not normally give rise to claims for money damages, but for specific performance remedies. *See id.* at 1334–35 (" '[T]he only remedies available for breach of a plea agreement are enforcement of the agreement or affording the defendant an opportunity to withdraw the plea . . . .' ") (quoting *1–95–CV–553–P1 v. 1–95–CV–553–D1,* 75 F.3d 135, 136 (2d Cir. 1996)). Articulating the rules for the alleged breach of criminal justice agreements, the court wrote:

> It is no doubt also true that in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), "damages are always

the default remedy for breach of contract." *Id.* at 885, 116 S.Ct. 2432 (plurality opinion) (citing, *e.g., Restatement (Second) of Contracts* § 346, cmt. a (1981)). Although agreements that are in part civil and in part criminal may be governed by the presumption concerning the availability of damages in civil cases, a different rule obtains where the agreement is entirely concerned with the conduct of the parties in a criminal case. A decision of one of our predecessor courts, the Court of Claims, has previously established that in those circumstances a damages remedy is not ordinarily available. In *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (Ct. Cl.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981), a federal grand jury witness brought a Tucker Act claim against the United States for the alleged breach of an immunity agreement. The Court of Claims held that it lacked jurisdiction to adjudicate the claim, noting that "[t]he contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Id.* at 268. That court did recognize that breach of such an agreement under some circumstances could support a damages claim under the Tucker Act:

> [I]t [is] possible to make a binding contract subject to Tucker Act jurisdiction, creating a liability for breach of a plea bargaining agreement or one to grant immunity for giving testimony, or to protect a witness. *But, in such case, the court would look for specific authority in the [Assistant United States Attorney] to make an agreement obligating the United States to pay money, and spelling out how in such a case the liability of the United States is to be determined.*

[*Kania v. United States,* 650 F.2d] at 268 (emphasis added [by the *Sanders* court]). In other words, a claim for money damages for the alleged breach of such an agreement may not be maintained unless that agreement clearly and unmistakably

subjects the government to monetary liability for any breach.

*Sanders v. United States,* 252 F.3d at 1334–35 (emphasis in original).

In the present case, a plea agreement was entered into between Mr. Duboc and the United States Attorney's Office for the Northern District of Florida, and also signed by Mr. Bailey and Mr. Shohat as Mr. Duboc's attorneys. In the plea agreement, Mr. Duboc agreed to forfeit all of his drug related assets, and "to assist the United States fully in the recovery and return to the United States of all such assets . . . ." If Mr. Duboc subsequently had filed a complaint in the Court of Federal Claims, alleging breach of the plea agreement and seeking money damages, the principles established in *Kania* and *Sanders* would lead to the dismissal of his complaint by the court. Mr. Duboc's remedy in such a case would be to seek enforcement of the plea agreement in district court. However, Mr. Bailey is not alleging a breach of Mr. Duboc's plea agreement. Mr. Bailey's amended complaint alleges breach of a contract between Mr. Bailey and the government, which called for services on Mr. Bailey's part, services which a number of the witnesses, including government witnesses, considered unusual and beyond normal defense counsel duties.

Both Mr. Bailey and AUSA Kirwin testified that they had never before seen a defense counsel, as part of defense counsel duties, engage in the scope of maintenance, liquidation and repatriation efforts as occurred in the present case. Mr. Bailey, in a memorandum to his client, stated: "[T]his kind of assistance in tidying up the aftermath of the seizure has never, to my knowledge, been made available to government attorneys by defense counsel in any prior cases." Similarly, AUSA Kirwin testified as follows:

Q [By Mr. Horwitz] in your practice in the U.S. Attorney's Office, had you ever in the past been involved in a case in which a defense attorney had been given stock with the assistance of the United States, such stock being subject to forfeiture?

A [AUSA Kirwin] Had I?

Q Yes.

A No.

Q Had you any experience in the past with a defense lawyer obtaining a line of credit collateralized by stock subject to or which had been forfeitable and using the line of credit to fund property and maintain property in a foreign country, such as Mr. Bailey did here.

A Are you speaking of me?

Q Yes.

A No, I had not.

Q How long had you been in the U.S. Attorney's Office by 1994?

A About two years, a little better than two years.

Q Since that time,[18] have you run across a situation where a defense lawyer has taken out a line of credit and spent money to upkeep and maintain property that was to be forfeited to the government?

A I have not.

The abnormal nature and scope of Mr. Bailey's maintenance, liquidation and repatriation efforts were noted in an earlier opinion in this case. *Bailey v. United States,* 46 Fed.Cl. at 201 ("Mr. Bailey's services in the repatriation of the European property went beyond normal criminal representation duties."). Plaintiff observes that:

The fact that Bailey's efforts as liquidator grow out of a criminal case does not make the liquidator contract subject to *Sadeghi [v. United States,* 46 Fed.Cl. 660 (2000)]. Rather, the government is not acting as sovereign but rather is acting in the capacity of a non-sovereign in disposing of stock and maintaining and disposing of other assets. While the contract grows out of a criminal case and therefore grows out of the government acting as sovereign, the contract itself does not involve the government acting as sovereign. The existence of a criminal case does not make all related contracts actions of the sovereign

---

**18.** In 1994, when the events of this case unfolded, Thomas F. Kirwin was an AUSA; subsequently, for a period of time he was appointed the interim United States Attorney for the Northern District of Florida.

as contemplated by *Kania* [*v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981)] or *Sadeghi.* If that were true, the government could not be sued by a construction company upon the breach of a construction contract if the contractor is building a prison. Prisons are related to the sovereign action of incarcerating persons convicted in the criminal justice system. The act of building the prison is however, not a sovereign act but an act in which the sovereign has stepped off the throne and has engaged in the purchase and sale of goods, lands and services.

\* \* \* \* \* \*

Mr. Bailey was not the criminal defendant in the *Duboc* case. Rather, as to the implied-in-fact contract for liquidator services, Bailey was dealing with the government in its proprietary capacity. When the government took control of the property outside the United States it had to deal with that property in a proprietary manner. It had to sell the Japanese stock like any seller of stock and did so through Bailey. It had to maintain the French estates like any owner and did so through Bailey. If the government had not used Bailey to sell the stock and maintain the property, it would have had to use someone else. Likewise, it used Bailey to fund the property maintenance costs through the arrangement with the Biochem Pharma stock. All these actions are proprietary.

In sum, although the present case is related to Mr. Duboc's criminal proceedings in Florida, plaintiff's complaint is for alleged breach of a contract between the plaintiff and the Department of Justice. Plaintiff has brought a contract claim exceeding $10,000.00 in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, which, jurisdictionally, could not have been brought in federal district court. This court has not been asked by Mr. Bailey, nor could this court, if asked, award attorneys' fees or costs in the *Duboc* criminal case, review expenses for the criminal case, review the District Court's decision to forfeit 602,000 shares of Biochem Pharma stock to the United States, consider a third party claim for the stock pursuant to 21 U.S.C. § 853(n), or enforce any aspect of Mr. Duboc's plea agreement. Plaintiff seeks review of an alleged breach of contract with the government, a matter within the exclusive jurisdiction of the Court of Federal Claims. Although as the discussion below demonstrates, there was no meeting of the minds and the contract alleged by plaintiff did not come into existence, it is not inconceivable that authorized individuals in the Department of Justice could contract for services related to their responsibilities as federal criminal justice prosecutors. In general, this court believes that unless jurisdictional defects are clear, this or any other plaintiff should be allowed a day in court. To this end, the court permitted the case to proceed to trial.

## II. *Implied–in–Fact Contract*

Plaintiff's amended complaint alleges breach of an express contract and of an implied-in-fact contract. However, plaintiff indicated in post-trial briefing that the evidence supports only the existence of an implied-in-fact contract, contending that:

> The Plaintiff established an implied-in-fact contract under which Bailey was to maintain and liquidate property forfeitable to the government by Duboc. The contract also included Bailey assisting the government in achieving the goal of maximizing the return on the forfeitable assets by taking the Biochem Pharma stock, and assuming the risks associated with a change in the price of stock. The parties recognized a need for funds to maintain and liquidate the forfeitable assets in France. In order to obtain those funds and maximize recovery Bailey agreed to take the Biochem Pharma stock rather than have the government forfeit the stock in April 1994 which would have drastically reduced its value in the opinion of the parties. In taking the stock Bailey undertook the risk of price changes in the stock which the government could not do.

> The government received consideration by shifting the risk of the stock price to Bailey and having Bailey be accountable for the value of $5.8 million to maintain and liquidate the property. In addition, the government received consideration in

the form of Bailey's efforts as liquidator and the funds expended by Bailey to maintain the French property. Bailey's consideration was assuming the risk of the stock, obtaining the line of credit, and having the potential of the increase in value of the stock. The government had further consideration by not being required to transfer millions of dollars from a forfeitable account to Bailey to maintain the property.

Defendant first argues that Mr. Duboc's written plea agreement was an express agreement covering the same subject matter contained in plaintiff's alleged implied-in-fact contract, and that, therefore, the latter cannot exist. Defendant contends that, for any such implied contract to be given legal effect, it must be entirely unrelated to the express contract, citing *Trauma Service Group v. United States*, 104 F.3d at 1326. The United States Court of Appeals for the Federal Circuit in *Trauma Service* stated the rule: "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Id.* (citing *Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *see also W.M. Schlosser, Inc. v. United States*, 50 Fed.Cl. 147, 151 (2001); *Starflight Boats v. United States*, 48 Fed.Cl. 592, 599–601, *appeal dismissed*, 13 Fed.Appx. 960 (Fed.Cir.2001).

The Federal Circuit, in *Trauma Service*, concluded on the facts of the case that both a written agreement between the parties, and the alleged implied-in-fact contract, provided for the use of an x-ray technician for inpatient care. *Id.* at 1327. Similarly, in *Atlas*, cited in *Trauma Service*, the Federal Circuit concluded on the facts of that case that the cost of tailings stabilization, the subject of an alleged implied-in-fact contract, was a cost not entirely unrelated to the costs included in the express contract between the parties and that, therefore, there could be no implied agreement to pay costs over and above those prices. *Atlas Corp. v. United States*, 895 F.2d at 755. The alleged implied-in-fact contracts in *Trauma Service* and *Atlas* could not exist in the face of express contracts addressing the same subject matter contained in the implied-in-fact contracts. In contrast, the Federal Circuit reviewed the facts in *Barrett Refining Corporation v. United States*, and concluded that the express contract between the parties did not contain any clause covering price escalation, such that there was "nothing to preclude an implied-in-fact agreement on that term." *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1060 (Fed.Cir.), *reh'g denied* (2001).

Turning to the facts of the present case, defendant argues that the plea agreement was an express contract between Mr. Bailey and the government, thereby precluding an the alleged implied-in-fact contract between the same parties. However, it was Mr. Duboc's plea agreement with the government, although it was signed by Mr. Duboc and by Mr. Bailey and Mr. Shohat as attorneys for Claude Duboc. Mr. Duboc agreed to plead guilty, cooperate with the government, provide truthful testimony, disclose and forfeit all drug related assets, and assist fully in their return. Just as the express contract in *Barrett Refining* did not contain a price escalation clause, Mr. Duboc's plea agreement did not contain a clause addressing Mr. Bailey's efforts to assist in the maintenance, liquidation and repatriation efforts regarding Mr. Duboc's forfeitable property. Certainly, Mr. Duboc agreed to assist prosecutors to repatriate the identified assets. In that plea agreement, however, Mr. Duboc could not expect or commit Mr. Bailey's time and effort, which turned out to be not inconsiderable. At the trial, numerous witnesses in addition to Mr. Bailey and including members of the United States Attorney's Office offered testimony regarding the far more than usual for a defense attorney nature of those efforts. Moreover, the unusual nature of the transfer to Mr. Bailey of the Biochem Pharma stock, the government's decision not to immediately forfeit the stock and the fact that government officials traveled and worked with Mr. Bailey during the repatriation efforts might suggest a separate arrangement of some sort with Mr. Bailey, not with Mr. Duboc. Consistent with the *Barrett Refining* case, under the facts and circumstances of this case, Mr. Duboc's plea agreement, even if deemed an express contract for purposes of the rule enunciated in *Trauma*

*Service* and *Atlas,* does not preclude the possible existence of an alleged implied-in-fact contract between Mr. Bailey and the government.

■ The elements of an express contract are "a mutual intent. to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.) (citations omitted), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997). Plaintiff contends that the evidence supports an implied-in-fact contract, an agreement " 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' " *Trauma Serv. Group v. United States,* 104 F.3d at 1326 (quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)) (quoting *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *see also Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (citing *Trauma Service Group v. United States,* 104 F.3d at 1326), *reh'g and reh'g en banc denied,* 285 F.3d 1035, *cert. denied,* —— U.S. ——, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002). The Federal Circuit, in the *Barrett Refining* case, restated the elements of an implied-in-fact contract as mutuality of intent to contract; consideration; lack of ambiguity in offer and acceptance; and authority to bind the government. *Barrett Refining Corp. v. United States,* 242 F.3d at 1060. Proof of an implied-in-fact contract requires proof of the same elements described above for an express contract. *See City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). These elements are addressed below.

*Meeting of Minds*

■ The United States Supreme Court in *Baltimore & Ohio Railroad v. United States* stated that "an agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign," and declined to find an implied-in-fact contract under the facts of that case. *Baltimore & Ohio R.R. v. United States,* 261 U.S. at 598, 43 S.Ct. 425; *see also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties—'a coming together of minds.' ") (quoted in *Hercules, Inc. v. United States,* 516 U.S. at 424, 116 S.Ct. 981); *Barrett Refining Corp. v. United States,* 242 F.3d at 1059–60; *Atlas Corp. v. United States,* 895 F.2d at 754. In *City of El Centro v. United States,* the Federal Circuit concluded that the finding of facts by the United States Claims Court was not clearly erroneous, that "the various discussions between employees of the Government and of ECCH [claimant] when taken as a whole evidenced a sufficient meeting of the minds to establish mutuality of intent to contract." *City of El Centro v. United States,* 922 F.2d at 820 (The Federal Circuit, however, proceeded to find that there was no implied-in-fact contract, based on the absence of any official empowered to bind the government and. any direct benefit to the government from the claimant, *id.* at 821.)

Plaintiff Bailey argues that the facts and circumstances of this case demonstrate the requisite meeting of minds. Plaintiff discusses and relies on the United States Court of Claims case of *Thomson v. United States,* which involved an implied-in-fact contract between Mr. Thomson, a real estate appraiser, and a United States Attorney's Office. In the case, the government required the services of an appraiser in support of condemnation cases. *Thomson v. United States,* 174 Ct.Cl. 780, 782–83, 357 F.2d 683, 684 (1966). Authority to contract for appraisal services was retained by the Department of Justice in Washington, D.C. *Id.* at 783, 357 F.2d at 685–86. In *Thomson,* the authority to contract to retain the appraisal services was obtained, the appraiser was authorized to proceed and he was subsequently paid for his initial work. *Id.* at 784–85, 357 F.2d at 685. The controversy centered on the subsequent need of the United States Attorney's Office for additional appraisal services, and whether or not an

implied-in-fact contract for those services arose. The Court of Claims noted that:

> It is fundamental, however, that acceptance of an offer may be manifested either expressly (as by words) or impliedly by conduct indicating assent to the proposed bargain. The notion that assent to the terms of an agreement (i.e., acceptance) may be evinced by action or conduct underlies the rule, repeatedly recognized by the courts, that contracts may be "implied in fact."

*Thomson v. United States, id.* at 791, 357 F.2d at 689 (citations omitted). According to the court, the facts in *Thomson* indicated that a contract was formed. "He [Mr. Thomson] was not specifically asked to proceed nor was he told not to do the work. But, as will appear, the fair inference is that Assistant United States Attorneys did indicate the desirability of going forward and did encourage him, tacitly, to proceed." *Id.* at 785–86, 357 F.2d at 686.

In the case presently before this court, the record reflects a meeting of minds only on certain of the arrangements between the parties. The parties, for example, agreed that Mr. Duboc's high value, overseas drug related assets required considerable funds and efforts in order to maintain, liquidate and repatriate those assets, and that plaintiff would play a key role in these functions. The parties further agreed that the Biochem Pharma stock would be transferred to plaintiff's Swiss bank account, to be used by plaintiff for the management of the drug related assets. However, the parties part company on Mr. Bailey's critical term—the alleged tacit agreement that any appreciation in value of the Biochem Pharma stock, beyond the approximately $5.8 million value of the stock at the time the stock was transferred to plaintiff, was to inure to plaintiff's benefit.

In *Thomson*, there was no indication that a critical term lacked mutual assent. A critical term, however, was at issue in the *Barrett Refining* case. A price escalation clause was found to be unauthorized and unenforceable in the case. The Federal Circuit agreed with the Court of Federal Claims that there could be an implied-in-fact agreement on that critical term, and affirmed the lower court's factual findings of the "parties' intent to provide for fair market-value consideration of pricing . . . ." *Barrett Refining Corp. v. United States,* 242 F.3d at 1060. In contrast, no meeting of minds was found on a critical term in the case of *Atlas Corporation v. United States.* In *Atlas,* claimants argued breach of an implied-in-fact contract, based on an allegation that parties intended the claimants would be compensated for the stabilization of uranium and thorium milling operations. However, the Federal Circuit concluded otherwise: "[T]he parties have admitted that the extensive tailings stabilization ... was not even contemplated by the parties at the time of the contracts. Therefore, there can have been no negotiation and 'meeting of the minds' that could create an implied-in-fact contract respecting the cost of the stabilization." *Atlas Corp. v. United States,* 895 F.2d at 754. In *Atlas,* a meeting of the minds on the critical term was not found. Unlike the facts and circumstances in *Barrett Refining,* but similar to the facts and circumstances in *Atlas,* the record in the present case does not reflect a meeting of minds between the plaintiff and the government on the critical term proffered by plaintiff—that any appreciation in value beyond the approximately $5.8 million value of the Biochem Pharma stock at the time of the stock's transfer to plaintiff was to inure to plaintiff's benefit.

The government's representatives understood the arrangements with Mr. Bailey to be that the Biochem Pharma stock or its value not used for property maintenance or for attorneys' fees, as approved by Chief Judge Paul, would be forfeited to the government. As AUSA Kirwin testified, at the close of the meetings between the parties which occurred on April 25 and 26, 1994, his understanding was that the Biochem Pharma stock would be transferred to plaintiff to be used for the management of the overseas drug related assets and for attorneys' fees approved by Chief Judge Paul, with the remainder of the stock and stock proceeds forfeited to the United States. AUSA Kirwin testified as follows:

> Q [by Mr. Belkin] As of the close of the day on April 26th, [1994] what was your

understanding of the plan with respect to the stocks?

A [AUSA Kirwin] The stocks were going to be transferred to Mr. Bailey's account. They were to be used by him for the upkeep and maintenance of that property. I shouldn't say that property, the properties in France, specifically the two houses, we had a huge boat and a smaller big boat, a boat slip and some other assorted properties. So it was to be used for that. My view, it was to be used for whatever costs of the defense that would come up. I don't know what specifically would come up, but that and also that it would be used as a source for whatever attorney's fees Judge Paul deemed were reasonable at the end of the case. And then that, the remainder would come to the United States, would be forfeited to the United States.

Q I want to be very clear about this. You said the remainder would be forfeited to the United States. Was that a specific subject at any point during the meetings on the 25th and 26th [of 1994]?

A Yes, absolutely.

Later in the trial, AUSA Kirwin also testified that: "[T]he bottom line was, always was, that whatever was left from that fund [the Biochem Pharma stock], whether it never went up a dime or if it went up four-fold as Duboc told us he expected it would go up and as it turns out it did go up, that money was coming back to the United States to be forfeited." AUSA Kirwin's testimony is consistent with the testimony of other government representatives, Agent Lilley, and AUSA Miller, AUSA McGee and United States Attorney Patterson, as to their understanding of the arrangements. Mr. Bailey's understanding of the arrangements, as to his critical term, his belief that any appreciation in the value of the Biochem Pharma stock transferred to him beyond $5.8 million would inure to his benefit, but that the risk of a fall in the value of the stock below the cost of his services provided would be his, was not the understanding of the government representatives. There was no meeting of minds on Mr. Bailey's critical term. Furthermore, after listening to the testimony, the court con-cludes that the professed understanding of the government witnesses that any remainder of the Biochem Pharma stock and stock value, after fees and expenses had been approved by Chief Judge Paul, including any appreciation, would be forfeited to the United States was their understanding arrived at during and at the time of the negotiations with Mr. Bailey and not during subsequent court proceedings before Chief Judge Paul or upon the filing of this complaint. A review of the underlying facts and circumstances of the case verifies the sincerity of the government's professed understanding of arrangements between the parties, regardless of what the plaintiff may have believed to the contrary. For this reason no meeting of the minds between the parties occurred and no implied-in-fact contract came into being on Mr. Bailey's terms.

*Conflict of Interest*

The record reflects that at the time when Mr. Bailey undertook to assist in the repatriation efforts, certain members of the United States Attorney's Office were concerned about Mr. Bailey's repatriation property management and liquidation role as triggering a conflict of interest, a factor which bears on the government's understanding of Mr. Bailey's critical term that plaintiff was to receive the benefit of any rise in the value of the Biochem Pharma stock. The issue raised was whether a defense counsel in a criminal case also should appear to be "on the government payroll" on matters related to that case. The issue was acute because all of defendant Duboc's assets were deemed forfeitable and there would be no assets remaining to pay attorneys' fees or expenses. For example, AUSA McGee testified about his concerns, in April, 1994, about plaintiff's repatriation role: "[T]he government cannot pay a defense attorney to represent a client. You can't have him on your payroll at the same time that he represents a Defendant before you. There's a huge conflict of interest inherent in that and it—you couldn't do it, the Judge wouldn't permit it. The Florida Bar wouldn't permit it." Regardless of whether in fact there was a true conflict of interest, from the testimony it appears that government representatives resolved the

conflict of interest issue in their own minds by avoiding placing Mr. Bailey on the government payroll, or paying Mr. Bailey directly out of forfeitable property, intending instead that Mr. Bailey be paid through attorney's fees and expenses approved by the District Court Judge handling the *Duboc* case, with the United States not taking a position on the amount or reasonableness of the compensation Mr. Bailey requested, and with no direct payments from the government to Mr. Bailey. In this regard, AUSA McGee testified that:

> [W]e thought it inappropriate to deprive Mr. Bailey of the opportunity to make the argument that he wished to make, which is that he should be paid from these forfeitable funds. So my advise [sic] was that we don't recommend that he get paid and we make that very, very clear to him and at the same time we don't deprive him of the opportunity. We allow him to make the argument to the Judge and we don't forfeit the assets in advance so that he can't make the argument to the Judge.

AUSA McGee also testified that the United States Attorney, P. Michael Patterson, asked him to communicate the above government position to plaintiff, and AUSA McGee did so. United States Attorney Patterson stated that:

> I wanted to make it absolutely clear that the government was not going to be involved in setting an amount or to be involved in whether or not there was an amount of attorneys' fees or any other remuneration flowing to Mr. Bailey, and I wanted it made absolutely clear to Mr. Bailey that we were going to play no part in that, that he would would [sic] have to look to the court for that aspect of the case, and I asked Mr. McGee to specifically have a conversation with Mr. Bailey about that.

Plaintiff argues that: "The existence of a potential conflict in Mr. Bailey's acting as government liquidator cannot be denied. Rather, the conflict was waived by Duboc through his transfer of assets to Bailey and knowledge that Bailey would liquidate the assets for the government. The conflict was also waived by the government through actions of utilizing Bailey to liquidate assets." Moreover, Mr. Bailey argues: "Even under the government's theory that Bailey was acting for Duboc and not the government, a conflict existed. The government created the conflict by transferring stock to Bailey and requiring Bailey to spend the proceeds of that stock to maintain the properties thereby reducing the amount available for attorney's fees for representing Duboc. This conflict is apparent yet obviously waived by Duboc and the government."

Whether or not there was a conflict or interest, and whether or not it was waived, the government perceptions and concerns regarding a conflict of interest support the professed understanding of government representatives as to the nature of the agreement into which the government thought it was entering. Based on the testimony, it appears that representatives of the United States Attorney's Office acted in a manner so as to be careful to avoid involvement in setting the rates for or paying remuneration to Mr. Bailey for his defense counsel work and repatriation services, always intending to defer to the District Court on the matter of Mr. Bailey's compensation. In fact, witnesses at the trial, such as AUSA Kirwin, testified that Chief Judge Paul was adamant that all drug derived assets be forfeited to the benefit of the United States, with no exceptions, prior to accepting a plea. It would have been incongruous for members of the United States Attorney's Office, given their understanding of the Chief Judge's position on the subject of forfeiture, nevertheless to have agreed to the critical term proffered by plaintiff—that the government intended for the appreciation in value beyond the approximately $5.8 million value of the Biochem Pharma stock at the time of the stock's transfer to plaintiff to inure to plaintiff's benefit, despite the fact that the stock was forfeitable property. The record reflects instead a concern on the part of government officials to avoid a possible or real conflict of interest stemming from any government involvement in setting Mr. Bailey's remuneration for his repatriation efforts, whether attorney's fees or stock appreciation. Thus, regardless of what Mr. Bailey may think he heard at the meetings setting up the ar-

rangements for how plaintiff would be compensated for his repatriation efforts, it is clear from the testimony that the members of the United States Attorney's Office were wary of Chief Judge Paul and his position on forfeitures and would have done nothing to jeopardize acceptance of the plea agreement to be entered into by defendant Duboc or to jeopardize what they anticipated would be a major forfeiture of ° assets to the United States. The government concern not to create a conflict of interest situation is further evidence that there was no meeting of minds which would allow Mr. Bailey to benefit from any rise in the value of the Biochem Pharma stock after its transfer to plaintiff's account.

*Compensation*

On April 20, 1994, Mr. Bailey, Mr. Shapiro and Mr. Duboc met with AUSA Atchison, AUSA Kirwin, AUSA Miller and Agent Lilley. Mr. Duboc indicated at that meeting that it was in his best interest to cooperate with the government and disclose his illegal activities, assets and holdings. On April 26, 1994, Mr. Bailey and Mr. Duboc again met with various government representatives. At this meeting, Mr. Duboc expressed concern that if the 602,000 shares of Biochem Pharma stock were sold as a block, that such action might depress the stock and have an adverse effect on the company itself. As noted above, the record reflects that Mr. Duboc expressed the belief that the Biochem Pharma stock might rise in value and was interested in this potential in order to maximize his forfeiture, to demonstrate extraordinary cooperation with the government and seek leniency at his sentencing. On May 4, 1994, Mr. Bailey and AUSA McGee met with Chief Judge Paul. Mr. Bailey advised at this meeting with Chief Judge Paul that there probably would not be a trial in the *Duboc* case, and indicated that Mr. Duboc's cooperation "would be something way out of the ordinary."

According to the testimony, Chief Judge Paul had a reputation for demanding complete cooperation on the forfeiture of drug related assets. In this regard, AUSA McGee testified as follows:

Q [by Mr. Belkin] Did you describe Judge Paul's approach, if he had any, to forfeitures?

A [AUSA McGee] Yeah.

Q Could you—

A You have to understand, Judge Paul was famous for his attitude on forfeitures. He took everything. He would not allow the United States to enter a plea in which we agreed to less than all the forfeitable assets, he wouldn't let us do it. He wouldn't let the Marshals not take assets from Defendants because they were going to lose money. Even if the Marshals were going to lose money he would direct—he'd give them a Court order to go get it because his attitude was you got nothing from drug pursuits, nothing. He was very forceful about that and I would have commented on that [to Mr. Bailey and Mr. Duboc]. Judge Paul was famous for this and it's something that I would have warned virtually everyone going before him about.

Q Was there some comment of Judge Paul's about a diaper that was described to Mr. Bailey and Mr. Duboc?

A Yeah. I don't remember the exact comment but Judge Paul said it more than once and—you know, he didn't care if it was the baby's diaper if it was bought with drug proceeds, he wanted it. He—Judge Paul would himself give these lectures in Court about the forfeitures. So it was—you needed to warn people because he was pretty forceful in this area.

Mr. Bailey continued the same theme of maximum cooperation with the government regarding forfeitures in a letter dated May 4, 1994 to Mr. Duboc, prior to the transfer of Biochem Pharma stock to Mr. Bailey, in which he stated that: "We are attempting to break new ground in your case, and the key word here is *extraordinary*." (Emphasis in original.) Mr. Bailey added: "[Y]ou could give your *complete and immediate* cooperation, and stand an excellent chance of being well-rewarded with respect to your ultimate sentence of confinement." (Emphasis in original.)

As to the government's understanding with respect to the Biochem Pharma stock, AUSA

Kirwin testified that, after property management expenses and attorneys' fees approved by the District Court, the remainder "would come to the United States." In further examination at trial about the meetings with Mr. Bailey on April 25 and 26, 1994, prior to the transfer of the Biochem Pharma stock to Mr. Bailey, AUSA Kirwin testified:

Q [by Mr. Belkin] What specific recollections do you have about the discussions regarding the Biochem Pharma stock?

A [AUSA Kirwin] Well, specifically, I know that Mr. Duboc told us that that stock was going to increase dramatically in value. He was interested in seeing that increase occur. His feeling was that a [sic] the more money he gave over, the better he would look to the judge, the sentencing judge, in terms of forfeiture.

Q Was that statement made by Mr. Duboc made in the presence of Mr. Bailey?

A Oh, absolutely. We didn't have any conversations with Mr. Duboc outside the presence of Mr. Bailey on the 25th or 26th [of 1994].

Q Did Mr. Bailey give any indication or make any statements regarding that intent as expressed my [sic] Mr. Duboc?

A I think—

Q Meaning the maximization of the amounts forfeited?

A You know, I think everybody agreed it would probably, you know, be a good thing and Mr. Bailey was among those—was among us when we were talking about that, I should say.

Q Did any defense counsel use any catch phrases or words to describe the proposed cooperation?

A Yeah. I mean the one word that was used constantly in [sic], sort of as the lynchpin of the plan was extraordinary, that Mr. Duboc, Mr. Duboc's hope of getting out of prison at any time in the future was to provide extraordinary cooperation. That was Mr. Bailey's plan to get the best result for Mr. Duboc, and it was extraordinary in all efforts.

Similarly, Agent Lilley testified as follows:

Q [by Mr. Belkin] Was there any specific discussion about who would be entitled to the increase in value of the Biochem Pharma stock if it did increase in value?

A [Agent Lilley] The United States government.

Q There was a specific discussion of that?

A Well, that's why Duboc wanted to, he wanted to see the stock's increase in value which would maximize his efforts.

Q And that specific discussion, statement by Mr. Duboc was in the presence of Mr. Bailey?

A I'd say, yes. I mean those discussions certainly were said when Mr. Bailey was present.

Agent Lilley also was asked at trial by government counsel:

Q [by Mr. Belkin] Based upon those conversations with Mr. Duboc in which defense counsel were present, did you have an understanding of why Mr. Duboc wanted to maximize the amount forfeited to the United States?

A [Agent Lilley] Yes, it would go to his benefit at time of sentencing. Looking at the cooperation he was doing with the government would later be, later the district judge would be informed of his cooperation, as well as the probation people.

\* \* \* \* \* \*

Q Did Mr. Bailey, as Mr. Duboc's counsel, make any comment regarding maximizing forfeitures?

A Yes.

Q What were those comments, if any?

A I don't remember his exact wording, but it was going to be something that we, like we've never seen before, Duboc's cooperation and the surrendering of the assets. I mean I don't remember his terms that he was using, but it was going to be complete. It was going to be truthful. And of course he's talking to his client at the same time, telling him this is what you've got to do in order to get this.

Similarly, AUSA Miller testified that it was defendant Duboc's intent to maximize the forfeiture amount to his benefit before Chief Judge Paul, by allowing the stock to increase in value.

The record reflects that prior to the transfer of stock to Mr. Bailey, the government understood that Mr. Duboc and Mr. Bailey intended to demonstrate extraordinary cooperation through Mr. Duboc's forfeiture of drug related assets. Mr. Bailey reiterated this same theme after the stock was transferred to him on May 9, 1994. In a memorandum to Mr. Duboc dated July 21, 1994, Mr. Bailey described the level of cooperation with the government: "[T]he key word extraordinary is appropriate. In short, this kind of assistance in tidying up the aftermath of the seizure has never, to my knowledge, been made available to government attorneys by defense counsel in any prior cases. It is the kind of 'extra mile' which impresses Judge Paul." (Emphasis in original.)

As noted above, the professed understanding of government representatives was that unused Biochem Pharma stock and stock proceeds, following completion of repatriation efforts would be available for attorneys' fees and expenses, only to the extent approved by the District Court. In the minds of government representatives, Mr. Bailey's compensation would be in the form of attorney's fees and expenses approved by Chief Judge Paul, not stock appreciation. AUSA McGee, the First Assistant United States Attorney, who reported directly to United States Attorney Patterson, testified that he told Mr. Bailey: "The United States wasn't going to pay him [Mr. Bailey] anything. We will allow him to make the argument to the Judge. At the end of the case he can make an argument to the Judge that he ought to get money out of the forfeitable assets. If the Judge—the Judge might—may well turn him down and we couldn't give him any representation with regard to what the Judge would do." AUSA Kirwin testified that the Biochem Pharma stock would be used for "whatever costs of the defense that would come up.... whatever attorney's fees Judge Paul deemed were reasonable at the end of the case." AUSA Miller similarly testified that it was explained to Mr. Bailey that expenses and fees were to be determined by Chief Judge Paul at the end of the case: "It was going to be based upon his application and a determination of reasonableness." Furthermore, Agent Lilley testified that his understanding was that

compensation for Mr. Bailey and Mr. Shohat for their time and efforts on the defense and for their time and efforts in Europe on the repatriation effort would be determined by the District Court. Having concluded that it was necessary to defer to Chief Judge Paul to set reasonable expenses and fees, it does not follow that government officials nevertheless intended that, in addition to whatever compensation was awarded by the District Court, the government would permit any stock appreciation on a forfeitable asset to inure to plaintiff's benefit. The record reflects deference to the District Court to set compensation for Mr. Bailey and his colleagues, rather than a contrary meeting of minds between plaintiff and the government on additional compensation via possible stock appreciation.

Plaintiff argues that the "evidence of the conduct of the parties in light of the surrounding circumstances shows the tacit understanding that Bailey was to receive compensation for maintaining the property which was separate from his fees for representing Duboc," and that any possible appreciation in the Biochem Pharma stock should inure to his benefit. Emphasizing the extraordinary nature of the forfeiture and cooperation involved, plaintiff draws support for his position that he was to receive property management compensation pursuant to an implied-in-fact contract with the United States Attorney's Office, separate and in addition to attorney's fees to be approved by Chief Judge Paul, from testimony elicited from AUSA Miller on cross-examination:

Q [by Mr. Horowitz] Now, your understanding, in discussions with Mr. Bailey, according to your testimony, is that Judge Paul was going to be allowed to set reasonable attorney's fees at the end of the case?

A [AUSA Miller] That is correct.

Q Isn't it true that it was your understanding that the fees to be set was separate and apart from the management of the property?

A That is correct.

AUSA Miller further testified, however, that:

Q [by Mr. Belkin] When you testified that they were separate and apart, mean-

ing the fees from the management, what did you mean?

A [AUSA Miller] When the fees are—okay, the management—the costs as to management were strictly costs. Things that they were going to be paying out of those funds were strictly for payment of upkeep, for custodians, for pool service, for maintenance items. Fees for services were to be determined by—attorney's fees for services were to be determined by Judge Paul. That was a separate aspect of what was going on. Those stock funds as they were being liquidated by these attorneys, they were supposed to be using them to pay the property and only—pay for the upkeep of the property and only at the end of the case were they then to seek from Judge Paul how much they would get out for their fees for services.

AUSA Miller's testimony cited by plaintiff does not provide support for the argument that plaintiff should be entitled to any appreciation of the Biochem Pharma stock.

Although not clearly enunciated by the parties, there appear to be four separate types of possible compensation to be claimed in two distinct categories. First, as in any other criminal case plaintiff Bailey, and his co-counsel Shapiro and Shohat, were entitled to apply to the presiding Judge, in this case Chief Judge Paul, (a) for attorneys' fees and (b) for expenses incurred during their representation of the criminal defendant Claude Duboc. Second, under the circumstances of this case, plaintiff Bailey, and to a lesser extent attorney Shohat, were to be entitled to compensation, including (a) time spent and (b) expenses, in their repatriation efforts regarding property overseas regarded as forfeitable property. The source of funds identified by the parties, and subsequently transferred to plaintiff Bailey for use in the repatriation efforts was the Biochem Pharma stock, which also from the outset was identified as forfeitable property. As a way to increase forfeitable assets to the maximum extent possible, defendant Duboc apparently encouraged holding on to the stock because he believed it would appreciate in value, increase the size of the forfeitable estate, and, therefore, assist him in his plea bargaining

and sentence reduction goals. Thus, the Biochem Pharma stock was transferred to plaintiff Bailey. The record reflects that there were discussions between the plaintiff and the prosecutors, that because of the absence of non-forfeitable property remaining with defendant Duboc to pay attorneys' fees, the United States Attorney's Office would not oppose a request to Chief Judge Paul to pay substantial fees and expenses to defense attorneys, including plaintiff, out of the Biochem Pharma stock fund. Those discussions, however, did not foreclose the prosecution's understanding that the balance of the value of the Biochem Pharma stock, including any appreciation in value, would continue to be considered forfeitable property to the United States. Given the uniform testimony of the government officials involved, that Chief Judge Paul would have to approve all compensation, fees, costs or attorneys' fees, however characterized, and the absence of any written instrument or contrary testimony other than plaintiff's, there was no meeting of the minds that any such appreciation in the value of the stock was to be to Mr. Bailey's benefit. Oddly, although Mr. Bailey ultimately did make requests to Chief Judge Paul to compensate his co-counsel, Robert Shapiro and Edward Shohat, on his own behalf he only made requests for his expenses and not for his fees, either for his representation of defendant Duboc or for time expended in his repatriation efforts. Perhaps he did so believing he would be adequately compensated for all his efforts through the Biochem Pharma stock appreciation. Regardless of his belief, however, the record is devoid of a meeting of the minds that Mr. Bailey was entitled to any such stock appreciation benefit as compensation.

*Ambiguity*

In addition to a meeting of minds, implied-in-fact contracts, no less than express contracts, require lack of ambiguity and definiteness in offer and acceptance. *Tree Farm Dev. Corp. v. United States*, 218 Ct.Cl. 308, 319, 585 F.2d 493, 499–500 (1978) ("A definite offer and an unconditional acceptance must be established.... It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mu-

tuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract ...") (quoting *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608–09, 537 F.2d 474, 481–82 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977) (footnotes omitted)); *see also Kollsman v. United States*, 25 Cl.Ct. 500, 514 (1992) ("An offer must be unambiguous, and acceptance must be manifested unambiguously by conduct that indicates assent.") (quoting *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 458 (1987)).

The record reflects ambiguity and indefiniteness as to plaintiff's critical term, plaintiff's alleged entitlement to any Biochem Pharma stock appreciation. At trial, Mr. Bailey testified to his understanding that he had received approximately $5.8 million in Biochem Pharma stock, but with a need to account only for that $5.8 million, even if the stock appreciated. According to Mr. Bailey's testimony, in his mind, any appreciation above $5.8 million would inure to his benefit, and if the stock fell below the value of his expenditures in the repatriation efforts, the risk of such loss would be to his detriment. In contrast, government representatives such as AUSA Kirwin, Agent Lilley, AUSA McGee, AUSA Miller and AUSA Atchison testified that the government always intended that Mr. Bailey account for all the stock, not merely for the $5.8 million value of the stock at the time of transfer to Mr. Bailey.

Discussing the May 17, 1994 conference before Chief Judge Paul, Mr. Bailey testified as follows:

I acknowledged that I had received the six million dollars. There was no talk of shares, that I recall. And that I was holding it, but no fees had been taken from it, and that because of my understanding with the Government, all fees would ultimately at the end of the case be approved by Judge Paul.

Mr. Bailey provided additional detail in a June 11, 1997 affidavit contained in the exhibits submitted at trial:

20. On May 9, 1994, 602,000 shares of Biochem shares were delivered to my personal account in Geneva. They were not delivered to this account with any notation that they were impressed with a trust. Their value at that date as calculated by the bank was $US 5,891,352.00. I treated that as money held by me as an account in which the United States had a possible ultimate interest, to this extent: after the payment of costs associated with the case, and my management fees and approved legal fees, the balance of up to $US 5,891,-352.00, if any, would revert to the United States. Anything above the $US 5,891,-352.00 would belong to me ....

AUSA Kirwin attended the same May 17, 1994 conference before Chief Judge Paul. His notes of the conference, dated May 17, 1994, the same day as the conference, indicated that Mr. Shohat had raised the issue of

a portion of [Mr. Duboc's] Japanese stocks placed in trust in his [Mr. Shohat's] acct [sic]. GRM [AUSA Miller] informed him [Mr. Shohat] that wasn't acceptable, that the stocks held by Bailey wld [sic] be sufficient. MMP [Chief Judge Paul] said that the arrangement [with] Bailey re: fees was sufficient. Bailey & Shohat will account for costs & reasonable fees to MMP who will have final say on fees.

AUSA Kirwin was asked at trial whether the discussion in the May 17, 1994 conference was of "stock" being transferred to plaintiff, or of "funds," i.e., the $5.8 million value of the stock at the time the stock was transferred to plaintiff. AUSA Kirwin's response was "stock" not "funds," that he had written the word "stocks" in his notes, quoted above ("stocks held by Bailey"), and would not have used that term if another term had been used at the conference. AUSA Kirwin's recollection was that Mr. Shohat was seeking the same type of agreement with the Japanese stock for himself that Mr. Bailey had with the Biochem Pharma stock. AUSA Kirwin's notes also indicate that Mr. Shohat was seeking Japanese stocks, to be placed in a trust account. As noted earlier, AUSA Kirwin and other government representatives testified to an understanding that Mr. Bailey was to account for the stock, and to remit to the United States stock and stock proceeds not used for property management or approved for attorneys' fees. In the govern-

ment's view, the accounting, and the remission, was not limited to the approximately $5.8 million value of the stock at the time of its transfer to Mr. Bailey. The government understood Mr. Bailey to be accountable for the stock itself as a forfeitable asset to the United States.

Mr. Bailey, however, viewed himself as accountable for the dollar value of the stock received, the $5,891,352.00, and not for the stock shares themselves. AUSA Kirwin testified that, "obviously we had not seen eye to eye on what the agreement was." The record does not reflect the requisite definiteness and lack of ambiguity to form an implied-in-fact contract. Rather, the record reflects at best confusion as to the terms of the arrangements—the bargain between the parties—what was offered and what was accepted, not a meeting of the minds. *See Tree Farm Dev. Corp.*, 218 Ct.Cl. at 319, 585 F.2d at 499–500.

*Ability to Sell the Stock*

Mr. Bailey argues that an implied-in-fact contract can exist even when disavowed by government representatives:

> The fact that the government witnesses say that they did not intend to contract is not enough to overcome the proof of the implied in-fact [sic] contract in this case. The case of *Sperry Corp. v. United States*, 13 Cl.Ct. 453 (1987) is an example of the Court's holding that an implied in-fact contract can exist when the government representatives disavowed the intent to contract litigated [sic]. If implied in-fact contracts were dependent upon a government representative agreeing that he intended to contract there would probably never be an implied in-fact contract.

In *Sperry*, the defendant relied on affidavits indicating that the Navy, by projecting future needs, did not intend to commit to purchase those needs from the contractor. *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 459 (1987). The court, in a footnote, stated that: "Defendant's affiants also disavow an intent to contract. It is immaterial whether defendant's agents intended to create an implied contract as long as their statements or actions support its formation." *Id.* at 459 n. 3. The court's footnote is the legal equivalent

of the old adage that actions speak louder than words. The court in *Sperry* proceeded to deny the parties' cross-motions for summary judgment, set the case for trial, and stated that the contractor will have to prove that the parties intended to contract and that the Navy induced the contractor's performance. *Id.* at 459–60. "Although inducement is not an element of a contract implied in fact, inducement and encouragement to do work may constitute implied acceptance." *Id.* at 458 (citing *Thomson v. United States*, 174 Ct.Cl. at 788, 357 F.2d at 689). In the present case, the examination of testimony and exhibits introduced at trial regarding a possible conflict of interest, and the intention of government representatives to have all payments to Mr. Bailey approved by Chief Judge Paul leads to the conclusion that the "statements and actions" of the government representatives do not support the assertion that any stock gain was to be to Mr. Bailey's benefit.

Mr. Bailey contends that the arrangements between the parties can be derived by implication, more specifically, once the stock was transferred to him, from his ability to sell any and all of the Biochem Pharma stock at any time, and from the allocation to him of the risk that the stock might diminish in value and thereby leave him with no source of compensation for his efforts. Mr. Bailey argues that his unrestricted ability to sell the Biochem Pharma stock at his discretion is a critical indication of the rectitude of his position that any stock appreciation beyond $5.8 million would be to his benefit while any loss was also to be his risk. According to the plaintiff:

> This right to sell the stock at his discretion is crucial to the existence of the contract allowing Bailey the profits. It is submitted that this crucial point is the reason that AUSA Miller testified that Bailey could sell the stock only as absolutely necessary to maintain the French properties.... First, Mr. Kirwin agrees with Bailey that he had the right to sell the stock at his discretion. This fact, as noted above, is critical for if the agreement was that the government have the upside gain and Bailey the downside loss, than [sic]

Bailey could not sell the stock unless necessary to maintain the property (as Miller contended).

As discussed earlier, AUSA Miller originally had suggested that $3.5 million in one of Mr. Duboc's foreign bank accounts be transferred to plaintiff to cover repatriation costs and legal fees. However, Mr. Duboc had expressed concern that if the 602,000 shares of Biochem Pharma stock were sold as a block, that action might depress the stock and have an adverse effect on the company itself. Mr. Duboc also believed that the Biochem Pharma stock might rise in value and was interested in that potential in order to maximize his forfeitures, demonstrate extraordinary cooperation with the government and seek leniency at his sentencing. Agent Lilley testified as to his understanding based on his personal experience with stocks and asset forfeiture, that the government would sell the Biochem Pharma stock immediately. AUSA Kirwin similarly testified that there were discussions indicating that the stock would be sold quickly as a block if it came into the government's custody, an action which likely would depress the value of the stock. Agent Lilley then suggested that rather than transferring the $3.5 million cash contents of one of Mr. Duboc's foreign bank accounts to plaintiff to fund the management of foreign drug related assets, that the Biochem Pharma stock be transferred to plaintiff instead. Subsequently, this suggestion was adopted and the Biochem Pharma stock was transferred electronically, unencumbered, to plaintiff's Swiss bank account.

At trial, AUSA Miller offered his view that plaintiff's use of the stock was constrained:

Q [by Mr. Horwitz] Now, is it true that Mr. Bailey had the right to sell all the stock the day after he got it if that's his decision?

A [AUSA Miller] No, that was not the understanding of what he told the court, what was said to the court and what counsel's understanding was, Mr. Shohat's understanding, my understanding, Mr. Duboc's understanding as to what he was to do with that stock. He wasn't to sell the entirety of the stock. He was only to

liquidate the amount of the stock necessary for the upkeep of those properties and to maintain and hold the remaining corpus of that stock pool so that it could continue to grow at the desire of his client, so that it could maximize his value and possible forfeitures to the United States.

And AUSA Kirwin, for his part, testified to his understanding, that, "whatever Mr. Bailey needed to do with the stock, he could do with the stock," but added: "I thought Mr. Bailey was going to sell what he needed to, you know, to fund it [repatriation efforts]."

Nevertheless, even an ability to freely sell stock is not dispositive on the issue of whether or not there was tacit agreement that any stock gain would be to Mr. Bailey's benefit. Discretion to sell stock is consistent with a requirement for a full accounting and ultimate forfeiture of the stock and stock proceeds to the government, including any stock appreciation, especially when coupled with the apparent desire, clear in this record, on the part of defendant Duboc and government officials, to maximize the dollar value of the forfeiture to the United States.

*Risk of Stock Depreciation*

Also in support of his contention that any Biochem Pharma stock gain was his, Mr. Bailey adds a second argument—the risk of the Biochem Pharma stock depreciating in value. Plaintiff argues that: "The government received consideration by shifting the risk of the stock price to Bailey and having Bailey be accountable for the value of $5.8 million to maintain and liquidate the property." Essentially, Mr. Bailey argues that he took the stock with the understanding that any risk that the stock would lose value would be his, so that, therefore, any stock appreciation also would be his.

On April 26, 1994, a private meeting was held between AUSA Miller and Mr. Bailey during which the transfer of stock was discussed. Mr. Bailey testified about the meeting as follows:

Q [by Mr. Horwitz] And what did Mr. Miller say to you?

A [Mr. Bailey] He [Assistant United States Attorney Miller] said, "I want to make it very plain to you, that as these

forfeitures take place, the money goes to the U.S. Marshall [sic] for distribution to various points. And you don't have to accept the stock, you can have the cash, but if you choose to accept the stock, which might help the Government, if it goes south there's nothing to pay you with. You run the risk of loss. You'll be taking a gamble," he said, "If you want to do that, that's fine. I just want to warn you we don't have another pot to reach into to help you out."

AUSA Miller testified about this same discussion with plaintiff as follows:

Q [by Mr. Belkin] Going back to this discussion of two possibilities, have you described to the Court everything that you recall about this discussion of two possibilities?

A [AUSA Miller] Well, as to what I was saying, there were two possibilities on the table. That it was something the defense needed to consider because they were gambling by holding onto this stock. The money could go up in value or the money could go down in value. It's not necessarily that Duboc is going to get greater credit if the stocks didn't go up as he anticipated. Very easily they could have gone done [sic].

But both Mr. Duboc and Mr. Bailey were very, very, very convinced in their representations to us that that was not a likelihood. They said they were going to go up.

At other points in his testimony, AUSA Miller discussed his use of the term "gambling," as follows: "I told him [Mr. Bailey] that it was a gamble for he [sic] and for his clients, that they may not be able to generate the amount of monies that they hoped to have. They may come out less then [sic] they turned it into the government than what it was worth when they first had it. It could have been $3 million they surrendered to the

government. They [sic] could have been $8 million. It could have been anything, but it was a gamble." Also, at another point in his testimony, AUSA Miller stated: "It was a gamble for both him [Mr. Bailey] and his client. Both of them were gambling. Both he and his client were gambling that it could go up, it could go down, they wouldn't accomplish the purpose of what they hoped to do. I did tell him it was a gamble, that's correct." Thus, AUSA Miller testified that he made it clear to plaintiff that the selection of the Biochem Pharma stock rather than funds in a bank account, would be the only asset made available for the upkeep of the overseas property and for attorneys' fees. If the value of the stock were to be reduced significantly, there might not be funding for the overseas property upkeep or for attorneys' fees. AUSA Kirwin's testimony similarly indicated his understanding that the Biochem Pharma stock was the only source of funds, and if the stock lost its value, there might be no funds for the upkeep of overseas property or for attorneys' fees.

Defendant's counsel, however, argues that plaintiff's risk was "virtually non-existent, given the value of the stock ($6 million) [19] and the expected cost of maintenance ($1 million),[20] given the availability of other forfeitable assets, including the French estates, to fund defense fees, and given that Mr. Bailey was permitted to sell the stock in a reasonable manner as necessary." For his part, in testimony before the court, Mr. Bailey reasoned that: "The word gamble is a fairly common term. You can't gamble without an upside and a downside prospect, at least I've never understood that you could."

The record reflects both the "upside" and the "downside" prospects for the stock. If the stock were to diminish in value, the risk was that there may not have been funds to cover property management costs and attor-

19. In 1996, the Biochem Pharma stock was sold for a total of $15,681,205.00, after commissions. On May 9, 1994, when the Biochem Pharma stock was electronically transferred to plaintiff's Swiss account, the stock was computed by the Swiss bank to be worth $5,891,352.00.

20. Following submission of a claim by Mr. Bailey to the District Court, the court approved reimbursement in the amount of $1,221,177.06. The

claimed expenses included over $1.1 million for the maintenance and repatriation of the European assets. On appeal to the United States Court of Appeals for the Eleventh Circuit, the expenses awarded by the District Court were largely affirmed. *United States v. Bailey,* 175 F.3d 966, 970 (11th Cir.), *reh'g denied and reh'g en banc denied,* 192 F.3d 132 (1999) (table).

neys' fees, or to add to the dollar value of the forfeitures of drug related assets to the United States. On the other hand, if the stock appreciated in value, there likely would be funds available to cover the property management costs and attorneys' fees, and also to add to the dollar value of the forfeitures to the United States, reflecting, as discussed above, Mr. Duboc's extraordinary cooperation with the government. Mr. Bailey acknowledges the "downside," that is, what might happen if the stock depreciates and he could not recoup for his time and expenses. Mr. Bailey also assumes an "upside" that any stock gain was to be his. Other than Mr. Bailey's own understanding, reflected in his testimony, however, the record reflects that the government officials understood that any stock appreciation would be used for property management, attorneys' fees approved by District Court, as part of Mr. Duboc's extraordinary cooperation and maximum forfeitures to the United States, and also considered the size of the Duboc forfeitures to be a feather in the cap of the Office of the United States Attorney for the Northern District of Florida. In a memorandum from the United States Attorney, P. Michael Patterson, to the Deputy Assistant Attorney General, Criminal Division in Washington, D.C., he wrote, following a meeting with her: "[W]e intended our meeting to accomplish: Make you aware of and highlight the Duboc case, which by any measure we believe is the premier case currently being prosecuted in the United States, when measured by profits, quantity of drugs and/or, sophistication of operation . . . ."

In particular, as noted earlier, the record reflects that Mr. Duboc was interested in the potential for stock appreciation in value in order to maximize his forfeitures of drug related assets, in order to demonstrate extraordinary cooperation with the government and seek leniency at his sentencing. On May 4, 1994, Mr. Bailey and AUSA McGee met with Chief Judge Paul, at which time Mr. Bailey advised that Mr. Duboc's cooperation "would be something way out of the ordinary." This posture was consistent with testimony describing Chief Judge Paul's reputation for demanding complete cooperation on forfeitures. Before the Biochem Pharma

stock was transferred to Mr. Bailey on May 9, 1994, he continued the same theme of maximum cooperation in forfeitures in a letter dated May 4, 1994 to Mr. Duboc, prior to the transfer of Biochem Pharma stock to Mr. Bailey, in which he stated that: "We are attempting to break new ground in your case, and the key word here is *extraordinary*." (Emphasis in original.) Mr. Bailey added: "[Y]ou could give your *complete and immediate* cooperation, and stand an excellent chance of being well-rewarded with respect to your ultimate sentence of confinement." (Emphasis in original.)

As to the government's understanding with respect to the Biochem Pharma stock, AUSA Kirwin testified that, after property maintenance expenses and attorneys' fees approved by Chief Judge Paul, the remainder "would come to the United States." The following testimony was noted earlier concerning meetings with Mr. Bailey on April 25–26, 1994:

Q [by Mr. Belkin] What specific recollections do you have about the discussions regarding the Biochem Pharma stock?

A [AUSA Kirwin] Well, specifically, I know that Mr. Duboc told us that that stock was going to increase dramatically in value. He was interested in seeing that increase occur. His feeling was that a [sic] the more money he gave over, the better he would look to the judge, the sentencing judge, in terms of forfeiture.

Q Was that statement made by Mr. Duboc made in the presence of Mr. Bailey?

A Oh, absolutely. We didn't have any conversations with Mr. Duboc outside the presence of Mr. Bailey on the 25th or 26th [of 1994].

Q Did Mr. Bailey give any indication or make any statements regarding that intent as expressed my [sic] Mr. Duboc?

A I think—

Q Meaning the maximization of the amounts forfeited?

A You know, I think everybody agreed it would probably, you know, be a good thing and Mr. Bailey was among those—was among us when we were talking about that, I should say.

498

Q Did any defense counsel use any catch phrases or words to describe the proposed cooperation?

A Yeah. I mean the one word that was used constantly in, sort of as the lynchpin of the plan was extraordinary, that Mr. Duboc, Mr. Duboc's hope of getting out of prison at any time in the future was to provide extraordinary cooperation. That was Mr. Bailey's plan to get the best result for Mr. Duboc, and it was extraordinary in all efforts.

Agent Lilley also testified that any stock appreciation was to inure to the benefit of the United States, for example,

Q [by Mr. Belkin] Was there any specific discussion about who would be entitled to the increase in value of the Biochem Pharma stock if it did increase in value?

A [Agent Lilley] The United States government.

Q There was a specific discussion of that?

A Well, that's why Duboc wanted to, he wanted to see the stock's increase in value which would maximize his efforts.

Q And that specific discussion, statement by Mr. Duboc was in the presence of Mr. Bailey?

A I'd say, yes. I mean those discussions certainly were said when Mr. Bailey was present.

Agent Lilley also testified:

Q [by Mr. Belkin] Based upon those conversations with Mr. Duboc in which defense counsel were present, did you have an understanding of why Mr. Duboc wanted to maximize the amount forfeited to the United States?

A [Agent Lilley] Yes, it would go to his benefit at time of sentencing. Looking at the cooperation he was doing with the government would later be [sic], later the district judge would be informed of his cooperation, as well as the probation people.

This testimony reflects that prior to the transfer of stock to Mr. Bailey, Mr. Duboc and Mr. Bailey intended to demonstrate extraordinary cooperation with the government through Mr. Duboc's forfeiture of drug related assets. As noted earlier, Mr. Bailey reit-erated the same strategy in a memorandum to Mr. Duboc, dated July 21, 1994, describing cooperation with the government: "[T]he key word **extraordinary** is appropriate. In short, this kind of assistance in tidying up the aftermath of the seizure has never, to my knowledge, been made available to government attorneys by defense counsel in any prior cases. It is the kind of 'extra mile' which impresses Judge Paul." (Emphasis in original.)

Therefore, the record indicates that, if any understanding is to be implied from the words and conduct of most of the parties involved, Mr. Bailey and the prosecutors, it is that the remaining stock and stock appreciation, after reasonable requests by counsel for reimbursement were approved by the court, would be forfeited to the benefit of the United States. The record does not support the implication of an understanding which would allocate stock appreciation to be retained by Mr. Bailey. Mr. Bailey's basic rationale for his understanding of the arrangements with the government, that upside gain must follow downside risk, was never articulated and is not present in the record except in the mind of the plaintiff, particularly when a theme reiterated throughout the record alternatively reflects evidence that all of defendant Duboc's assets were to be forfeited as a demonstration of Mr. Duboc's extraordinary cooperation with the government for consideration at his sentencing. *See Tree Farm Dev. Corp.*, 218 Ct.Cl. at 319, 585 F.2d at 500 ("[A]cceptance of the offer [must] be manifested by conduct that indicates assent to the proposed bargain. *The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.*"); *MPE Bus. Forms, Inc. v. United States*, 44 Fed.Cl. at 425 (stating that implied-in-fact contracts require definite terms); *Kollsman v. United States*, 25 Cl.Ct. at 514 ("An offer must be unambiguous, and acceptance must be manifested unambiguously by conduct that indicates assent.") (quoting *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 458 (1987)).

Plaintiff, however, citing *H.B. Mac, Inc.*, suggests that the court should consider how a reasonable and prudent contractor would view the arrangements with the government. "[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998) (citation omitted); *see also MPE Business Forms, Inc. v. United States*, 44 Fed.Cl. 421, 427 n. 6 (1999); *Northrop Grumman Corp. v. United States*, 42 Fed.Cl. 1, 11 (1998). Plaintiff argues that:

In considering all the surrounding circumstances, what is a reasonable interpretation of Miller's statement that it was a risk and a gamble by Bailey taking the stock? The Defendant would have the Court interpret this language and the surrounding circumstances to mean: Bailey was to take the stock, incur the risk of loss if the price went down (including the risk of not being reimbursed for maintenance costs), but the government was to get the gain, thereby reserving any potential loss to Bailey. Plaintiff submits no contractor would agree to this and no government official could possibly intend to make such an offer. Rather, the plain meaning in the context of this case was Bailey would account for the value of the stock when received and the loss or gain would be his.

Plaintiff suggests that it would be a bad bargain for a contractor to agree to downside risk, but not upside gain. The court, however, does not evaluate the adequacy of consideration, only the existence of consideration. Whether the arrangements were a "good deal" for one or the other or both parties is not a matter for the court. An implied-in-fact contract is a mutual endeavor, requiring a meeting of minds of both parties on all of the elements of a contract, including consideration. It is a long established rule that the court will inquire only into whether there has been a bargained for exchange, and not into the adequacy of consideration. The United States Court of Claims has stated: "As there is no indication of fraud or misrepresentation on the part of the plaintiff, the court is not concerned with the adequacy of the consider-

ation furnished by the plaintiff." *Silverman v. United States*, 230 Ct.Cl. 701, 711, 679 F.2d 865, 871 (1982) (citing *Mills v. United States*, 187 Ct.Cl. 696, 700–01, 410 F.2d 1255, 1258 (1969)); *see also Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 264, 269 n. 9 ("If such a bargain is established, the fact that the Government miscalculated the benefit of these transactions does not amount to a failure of consideration.") (citing *Mills v. United States*, 187 Ct.Cl. at 700–01, 410 F.2d at 1258), *opinion amended on reconsideration*, 52 Fed.Cl. 637 (2002); *Florida Keys Aqueduct Auth. v. United States*, 7 Cl.Ct. 297, 299 (1985) ("A contract does not lack mutuality merely because a particular promise or obligation is not offset by a similar promise or obligation. The pertinent question is whether the agreement as a whole is supported by mutual consideration.") (citations omitted), *aff'd*, 790 F.2d 95 (Fed.Cir.1986) (table).

Although it is generally not the role of the court to weigh and compare the consideration received by each party to a contract, as noted above, plaintiff contends, in support of his version of the arrangement between the parties, that: "no contractor would agree to this [downside risk without upside gain] and no government official could possibly intend to make such an offer." To the contrary, the record reflects that the government would not have agreed to the stock appreciation inuring to plaintiff's benefit, given the concerns discussed earlier as to potential conflicts of interest arising from Mr. Bailey's role as defense attorney and as a contract liquidator; the government's understanding that plaintiff would seek reimbursement and attorney's fees from the District Court, and perhaps in the seven figure range for his defense attorney duties; Mr. Duboc's and Mr. Bailey's avowed intention to demonstrate maximum cooperation and maximum forfeitures of drug related assets; and Chief Judge Paul's disposition that all drug related assets must be forfeited. As for no contractor agreeing to downside risk without upside gain, the arrangements reflected in the record were not so one-sided as to have been avoided at all costs by reasonable and prudent contractors. If any stock appreciation

were to be forfeited to the United States, rather than inuring to Mr. Bailey's benefit, then Mr. Bailey and Mr. Duboc would be furthering their common goal of maximizing cooperation and forfeitures, with an eye on the sentencing process. Furthermore, compensation for attorneys' fees and expenses and for the work of property maintenance, liquidation and repatriation could be approved by the District Court, the same court that did approve over $1.2 million in expenses claimed by Mr. Bailey, including over $1.1 million associated with the property maintenance, liquidation and repatriation function, and attorneys' fees for Duboc defense attorneys other than Mr. Bailey, who made no request to the court for attorney's fees. Admittedly, it would have been an even better bargain for Mr. Bailey had there been agreement between the parties that any stock appreciation would be to Mr. Bailey's benefit, but the bargain that was struck, as reflected in the words and conduct of the parties in the record, was not one which would have been accepted only by unreasonable and imprudent contractors.

*Stock Held in Trust*

The parties have argued about the use of the term "trust" and whether or not Mr. Bailey held the Biochem Pharma stock in trust. Plaintiff argues a trust was never created. Defendant acknowledges that there are no documents in the record associated with the Biochem Pharma stock which contain language establishing a trust. Furthermore, AUSA Kirwin testified that he did not remember use of the term "trust" as to the stock transferred to plaintiff. Nor did AUSA Kirwin remember AUSA Miller using the term "trust" with respect to the stock transferred to Mr. Bailey. Similarly, AUSA Atchison testified that he was not aware of anyone using the term "trust" to describe the stock transfer to plaintiff. Defendant argues, nevertheless, that Mr. Bailey did hold the stock in trust, and, therefore, could not have profited from the stock's appreciation.

In the May 17, 1994 conference with Chief Judge Paul, Mr. Shohat also did not remember the specific term "trust" being used to describe the Biochem Pharma stock arrangements, but Mr. Shohat stated he believed that it was made clear to Chief Judge Paul that a trust was established.[21] The term "trust" surfaced in AUSA Kirwin's notes of the May 17, 1994 conference, but with respect to the Japanese stock which Mr. Shohat unsuccessfully sought to control, and not with respect to the Biochem Pharma stock transferred to Mr. Bailey. Mr. Shohat himself used the term "trust" in an unsuccessful attempt to have the Japanese stocks transferred "to an account I opened in trust for Mr. Duboc," reflected in a May 31, 1994 letter to AUSA Kirwin. Upon Mr. Shohat's initiative being rebuffed by AUSA Kirwin in a June 2, 1994 letter to Mr. Shohat, Mr. Shohat responded, in a letter to AUSA Kirwin dated the same day, June 2, 1994, using the term "trust," as follows: "it appears that funds will not be available for the upkeep of the French properties until Lee Bailey completes arrangements for a loan against the Swiss trust account holding the BioPharm stock."

Testifying about their recollection of a January 19, 1996 meeting between Mr. Bailey, AUSA Miller and AUSA Kirwin, Toni Kennedy O'Brien, Suzanne Marie Albright and AUSA Kirwin testified that the government took the position at the meeting that the Biochem Pharma stock had been transferred to plaintiff in trust. Plaintiff's position was that he was only required to account to the government for the approximately $5.8 million value of the Biochem Pharma stock value at the time of the transfer to his account of the stock, but not for the subsequent appreciation of the stock in value. In a January 21, 1996 letter to Chief Judge Paul, plaintiff referenced the January 19, 1996 meeting with government counsel, and, addressing the differing views of the parties, stated:

> The problem is neither complex nor very difficult, but it is probably unique in some respects. The issue presented is this: Did the language or conduct of the parties— Mr. Miller and myself, since no one else

---

21. During the trial, it became obvious that Mr. Duboc's three co-counsel, Bailey, Shapiro and Shohat, had developed serious disagreements.

The animosity of Mr. Shohat and Mr. Shapiro towards plaintiff Bailey was readily apparent to any observer of the proceedings.

was privy to our conversation—create a trust of some sort on April 26, 1994, and if so what were its terms? The answer is that the terms of "the deal" were simple and I intend and have always intended to honor them.

\* \* \* \* \* \*

When Mr. Shohat entered the picture, he demanded that I give him "half the money" as co-counsel. I told him that I had no authority to do that, since I had in principle agreed to hold the funds in the *nature of a trust,* with final approval for legal fees to be approved by Your Honor. [Emphasis added.]

\* \* \* \* \* \*

On the morning of Mr. Duboc's plea tender to the Court, we met in chambers.... *I* interjected that the payment of fees was to be ultimately approved by Your Honor .... There was *no* discussion as to any trust in which the government and I had any sort of joint interest other than "six million dollars." [Emphasis in original.] On May 9, 1994, 602,000 shares of Biochem shares were delivered to my personal account in Geneva. They were not delivered to this account with any notation that they were impressed with a trust. Their value on that date as calculated by the bank was $US 5,891,352.00. I viewed that as money held by me as an account in which the United States had an interest, to this extent: after the payment of costs associated with the case, and fees approved by Your Honor, any balance of the $5,891,352.00 remaining would revert to the United States.

\* \* \* \* \* \*

In the reasonable belief that I was entitled to the benefit of my sole management of the investment—always protecting the sum with which I was entrusted—I have made substantial changes of position financially. It would be totally unfair for the government to achieve some retrospective creation of an imagined "trust" of the shares, in view of the facts set forth above.

When asked at trial about his January 21, 1996 letter to Chief Judge Paul, Mr. Bailey testified as follows:

Q [by Mr. Belkin] You can stop there. There was no trust document created for those funds that you held; is that correct?

A [Mr. Bailey] There was no document of any kind created other than the transfer document.

Q And yet you considered those funds that you held to be held in trust; isn't that correct?

A No. If it were a trust, there would have been a trust document, I would have been a trustee and I couldn't borrow against it. It was in the nature of a trust because I was accountable.

Q But it was in the nature of a trust?

A Yes.

Q Okay.

A I had responsibilities.

Q Okay.

\* \* \* \* \* \*

Q So what I understand from this, and tell me if this is correct, is that you believed that you held the funds, 5.89 million, in trust but not—

A No.

Q —the shares?

A In the *nature of a trust,* the money, yes.

(Emphasis added.)

In sum, Mr. Bailey acknowledges that he held the $5.8 million value of the Biochem Pharma stock at the time it was transferred to him, not in trust, but, "in the nature of a trust," Mr. Bailey apparently viewed himself as responsible for the money and responsible to account for the use of the $5.8 million value, with the unused remainder of the $5.8 million to be remitted to the District Court. The argument presented by the defendant about a trust having been created turns out to be a semantic one, between the terms "trust" and in the "nature of a trust," and one which does not help to explain whether or not an implied-in-fact contract arose in which Mr. Bailey would be entitled to Biochem Pharma stock appreciation. Based on the evidence before this court, the court concludes that no contract came into being which would allow Mr. Bailey to be accounta-

ble only for the $5.8 million in stock value at the time of transfer, and to keep any appreciation in the value of the stock.

*Authority to Contract*

■ The defendant also argues that no government representative with the authority to agree that any stock gain would be Mr. Bailey's actually agreed to that arrangement: "Even if Mr. Bailey could demonstrate that he was told by AUSA Miller that he, not the Government, would be entitled to the appreciation in the stock value, he has not satisfied his burden of proving that any Government official with authority to approve such a forbearance had specific knowledge of that promise and ratified the agreement." As noted earlier, authority is a required element of both express and implied-in-fact contracts.

> The government "is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (quoting *Yosemite Park & Curry Co. v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978)); *see also Office of Personnel Management v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990) (agencies' unauthorized statements to citizens cannot obligate the Treasury for the payment of funds). A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself is unaware of the limitations on his authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

*Total Medical Management, Inc. v. United States,* 104 F.3d at 1321; *see also City of El Centro v. United States,* 922 F.2d at 820–21 ("Further, it is ECCH's [claimant's] responsibility to show that Agent Hernandez had the requisite contracting authority.") (citing *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972)). Similarly, the United States Court of Appeals for the Federal Circuit stated in *Trauma Service Group v. United States* that:

> TSG [the claimant] must prove all of the requirements for a binding contract in order to prevail under its implied-in-fact con-

tract theory. Turning first to the authority of the Government representative to bind the United States in contract, . . . [n]o one at the MTF [military treatment facility], including the MTF commander, had the independent authority to bind the Government. Therefore, this alleged implied-in-fact contract for the direct reimbursement of the x-ray technician cannot be enforced under the Tucker Act, even if TSG could show the remaining elements of contract formation.

> Thus, TSG cannot show either an express or implied-in-fact contract between itself and WACH [Winn Army Community Hospital].

*Trauma Serv. Group v. United States,* 104 F.3d at 1327 (footnote omitted); *see also Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378, 1380 (Fed.Cir.2001); *Jones v. United States,* 49 Fed.Cl. 516, 518 (2001); *Starflight Boats v. United States,* 48 Fed.Cl. at 598–99. Defendant has raised the authority issue, but plaintiff has the burden to demonstrate the existence of the government official's authority to contract. *Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1432 (Fed.Cir.1998) ("The burden was on Harbert/Lummus to prove that the CO [contracting officer] had the authority to enter into the oral, unilateral contract. The fact that Harbert/Lummus may have believed that the CO had authority is irrelevant; Harbert/Lummus must prove that the CO had actual authority.") (citations omitted), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *see also Trauma Serv. Group v. United States,* 104 F.3d at 1327; *McAfee v. United States,* 46 Fed.Cl. at 435.

Defendant argues that government representatives in contact with Mr. Bailey were acting within the scope of their authority with respect to the government's theory of the case, that is, permitting a defense counsel to use forfeitable drug related assets in order to maintain and repatriate other forfeitable drug related assets, with compensation for the defense attorney to be approved, not by the United States Attorney, but subsequently by a federal district court judge. Defendant also asserts that the authority to contract for

professional services, such as for the maintenance, liquidation and repatriation of drug related assets, if independent from the criminal *Duboc* case, was circumscribed, such that no one in the United States Attorney's Office in Florida, including the United States Attorney, had the sole authority, without the approval of higher DOJ procurement officials, to contract directly for such professional services. At the time the Biochem Pharma stock was transferred to Mr. Bailey, on May 9, 1994, the Attorney General had delegated contracting authority to the Assistant Attorney General for Administration, with the authority for that official to redelegate. *See* 28 C.F.R. § 0.77(m) (July 1, 1993); 48 C.F.R. § 2801.601 (October 1, 1993). A February 12, 1993 Delegation of Procurement Authority (DPA) to the United States Attorney for the Northern District of Florida (on that date, the office was held by Kenneth W. Sukhia), redelegated to him authority to contract for up to $25,000.00 for supplies, but limited contracting authority for services to $2,500.00. Requirements for services that exceeded $2,500.00 were to be forwarded by the United States Attorney's Office to higher DOJ procurement authority for processing.

P. Michael Patterson, the successor United States Attorney at the time the Biochem Pharma stock was transferred to Mr. Bailey on May 9, 1994, received his own Delegation of Procurement Authority, although belatedly. P. Michael Patterson became the United States Attorney in November, 1993. In a Revised Delegation of Procurement Authority dated ten months later, on September 23, 1994, the earlier Delegation of Procurement Authority to former United States Attorney Sukhia, dated February 12, 1993, was rescinded. In this revised delegation, United States Attorney Patterson was given expanded contracting authority, up to the small purchase ceiling of $25,000.00,[22] but only for non-professional services. The Delegation of Procurement Authority to United States Attorney Patterson apparently did not delegate any authority to contract for professional

services, the type of services arguably at issue in the present case.

Although Delegations of Procurement Authority pursuant to the FAR are normal sources for contracting authority, the FAR does not appear to have provided authority to personnel in the United States Attorney's Office in this case. United States Attorney Patterson was not delegated any authority until after the transaction with Mr. Bailey was completed. Even if United States Attorney Patterson had had the same authority delegated to his predecessor in office, he would have been authorized to contract for services only up to $2,500.00, without further approvals. When United States Attorney Patterson received his expanded Delegation of Procurement Authority, subsequent to the arrangements with Mr. Bailey, he was authorized to contract for as much as $25,000.00, but apparently only for non-professional services. Furthermore, there is no evidence in the record that United States Attorney Patterson attempted to redelegate any of this circumscribed procurement authority to AUSA Miller or to anyone else in his office.

Perhaps for these reasons, Mr. Bailey does not attempt to rely on the FAR or Department of Justice FAR supplement as the basis for the authority of AUSA Miller or any other government representatives who were in contact with Mr. Bailey when the arrangements at issue in this case were made. Mr. Bailey tries to rely, instead, on the doctrine of implied authority and 28 U.S.C. § 547(4) (1994) (Duties of the United States Attorney).

*Implied Actual Authority*

Mr. Bailey argues that the United States Attorney had implied authority stemming from the statute which prescribed the duties of United States Attorneys. The statute at 28 U.S.C. § 547 states:

> Except as otherwise provided by law, each United States attorney, within his district, shall—
>
> \* \* \* \* \* \*

---

**22.** Part 13 of the FAR, "Small Purchase and Other Simplified Purchase Procedures," was cited in United States Attorney Patterson's Delegation of Procurement Authority. 48 C.F.R. Part 13 (October 1, 1993). "*Small purchase* means

an acquisition of supplies, services, and construction in the amount of $25,000 or less using the procedures prescribed in this part." 48 C.F.R. § 13.101, at 176 (October 1, 1993).

(4) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice does not require the proceedings . . . .

28 U.S.C. § .547(4). Plaintiff argues that implied in section 574 "is the right to enter into contracts such as the one at issue here." The concept of implied actual authority was summarized recently in *Son Broadcasting:*

> Actual authority can be either express or implied in fact. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir. 1989). "Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms." *Starflight Boats v. United States,* 48 Fed. Cl. 592, 598 (2001); *Roy v. United States,* 38 Fed.Cl. 184, 188 (1997). "Actual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.'" *Roy,* 38 Fed.Cl. at 189 (quoting *Landau,* 886 F.2d at 324).

*Son Broadcasting, Inc. v. United States,* 52 Fed.Cl. 815, 820 (2002); *see also Salles v. United States,* 156 F.3d 1383, 1384 (Fed.Cir. 1998).

Plaintiff notes that part of the United States Attorney's duties are to "institute and prosecute proceedings for the collection of fines, penalties, and forfeitures . . . ." 28 U.S.C. § 547(4). The issue is whether contracting authority of the nature at issue in this case is an integral part of the collection of forfeitures, and, therefore, whether the only efficient way to collect forfeitures is to place contracting authority at the United States Attorney's level. For example, in *Cruz–Pagan,* the plaintiff argued that because DEA agents need information from informants, contracting authority is an "integral part of the duties assigned" to the agents, in order to permit informants to receive a portion of property seized and forfeited based on the information provided. *Cruz–Pagan v. United States,* 35 Fed.Cl. 59, 61 (1996) (quoting *H. Landau & Co. v. United States,* 886 F.2d at 324). The court in

*Cruz–Pagan* concluded that, even assuming that DEA field agents need the assistance of informants who expect compensation:

> It would appear that DEA could efficiently create such an expectation of compensation without granting contracting authority to its field agents. For example, DEA could adopt internal procedures that grant contracting authority to supervisors of the field agents and oblige the field agents to secure approval from their supervisors before agreeing to provide compensation for assistance. Alternatively, DEA could establish procedures by which DEA would evaluate the value of the information or service provided, and based on that evaluation grant compensation to informants on a fair and reasonable basis. DEA apparently has followed the latter approach.

*Cruz–Pagan v. United States,* 35 Fed.Cl. at 61. The court in *Cruz–Pagan* found that it was not necessary or essential for the DEA to grant contracting authority to field agents to perform their duties of collecting information, so long as alternative ways of obtaining approvals for arrangements with informants were available. *Id.* The court also found that the DEA's internal regulations expressly forbid field agents from exercising contracting authority. *Id.* at 62. The court concluded:

> Because the underlying authority to bind DEA in contract rests with DEA itself, if a DEA employee is to possess actual authority, then the employee must derive that authority from DEA, *i.e.,* DEA must delegate or grant the employee the authority to bind the agency in contract. Under *Landau,* such a delegation of actual authority can be either express or implied. Any implication of actual authority, however, must be reasonable and based on the particular facts of the case. Because DEA adopted procedures that specifically preclude field agents from exercising contracting authority, it simply is not reasonable to imply that DEA granted or delegated such authority to its agents.
>
> In other words, the doctrine of implied actual authority cannot be used to create an agent's actual authority to bind the government in contract when the agency's internal procedures specifically preclude

that agent from exercising such authority. Instead, the doctrine serves to fill in the gap when an agency reasonably must have intended certain representatives to possess contracting authority but failed expressly to grant that authority.

*Cruz–Pagan v. United States*, 35 Fed.Cl. at 62–63; *see also McAfee v. United States*, 46 Fed.Cl. 428, 437 n. 5 ("[T]he court cannot imply that the AUSA or USA possessed actual contracting authority where the internal regulations expressly preclude them from exercising such authority."), *appeal dismissed*, 243 F.3d 565, 2000 WL 1717120 (2000) (table); *Contel of California, Inc. v. United States*, 37 Fed.Cl. 68, 73 (1996); *California Sand and Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27 (1990), *aff'd*, 937 F.2d 624, 1991 WL 112816 (1991) (table), *cert. denied*, 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992).

Similarly, defendant contends that the Department of Justice has adopted internal procedures requiring that any agreements such as the one put forward by Mr. Bailey must be approved by the Assistant Attorney General, Criminal Division. Defendant notes that, under the provisions of the United States Attorneys' Manual, "only the Assistant Attorney General ('AAG') for the Criminal Division possesses the authority to agree to the use of forfeitable assets as payment to criminal defense counsel." Defendant cites the Manual, placing authority not in the United States Attorney's Office, but with the Assistant Attorney General of the Criminal Division, United States Department of Justice, in Washington, D.C.:

> No formal or informal, written or oral, agreements may be made to exempt an asset transferred to an attorney as fees for legal services from forfeiture under 18 U.S.C. § 1963 or 21 U.S.C. § 853 or any civil forfeiture statute without the prior approval of the Assistant Attorney General, Criminal Division. *See* USAM 9–111.700, *infra*.[23]

United States Attorneys' Manual (USAM) 9–111.300 ("Division Approval"), October 1, 1990. *See United States v. Saccoccia*, 165 F.Supp.2d 103, 108 (D.R.I.2001) (Citing USAM 9–111.300, the court stated: "[I]t is clear that Leavey [an AUSA] had no authority to promise that the government would refrain from seeking forfeiture and that Hill [a defendant's attorney], at least, was aware of Leavey's lack of authority. Hill acknowledged to both Leavey and O'Donnell [a defendant's attorney] that he knew that any such agreement required approval from the Department of Justice.")

In the present case, Mr. Duboc undertook, with the assistance of United States Attorney's Office personnel, to transfer Biochem Pharma stock, a drug related asset which was forfeitable, from Mr. Duboc's account to Mr. Bailey's account. Both parties agree that the stock was to be used for property maintenance expenses of other drug related assets subject to forfeiture and for fees approved by the District Court. The District Court would approve reasonable expenses and attorneys' fees, not the United States Attorney's Office. Therefore, under the government's view of the arrangements between Mr. Bailey and the United States Attorney's Office, prior approval of the Assistant Attorney General, Criminal Division, was not required by the provisions of USAM 9–111.300.

However, under Mr. Bailey's view of the arrangements, the Biochem Pharma stock was transferred directly to him not exclusively to fund property maintenance expenses and attorneys' fees to be approved by the District Court. Mr. Bailey's view was that the government agreed to permit any stock gain of this forfeitable asset to be Mr. Bailey's. Mr. Bailey's version of the agreement would have required the prior approval of the Assistant Attorney General, Criminal Division pursuant to the USAM 9–111.300 provisions quoted above. No one in the United States Attorney's office possessed the au-

---

**23.** The referenced USAM 9–111.700 provides as follows: "Agreements may be entered into to exempt from forfeiture an asset transferred to an attorney as fees for legal services, but only with the prior approval of the Assistant Attorney General, Criminal Division. *See* USAM 9–111.300, *supra.*" United States Attorneys' Manual (USAM) 9–111.700 ("Agreements to Exempt from Forfeiture an Asset Transferred to an Attorney as Fees for Legal Services"), October 1, 1990.

thority to agree that the right to any stock gain would be Mr. Bailey's account.

The record, however, does not reflect approval by the Assistant Attorney General, Criminal Division, pursuant to USAM 9–111.300, to forego the forfeiture of Biochem Pharma stock appreciation or to hire plaintiff in a separate capacity from his defense counsel duties. The record does contain separate memoranda from United States Attorney Patterson to the Deputy Assistant Attorney General, Criminal Division, to the Deputy Attorney General, and to the Attorney General, describing the government's understanding of the arrangements with Mr. Bailey—permitting the Biochem Pharma stock to be used only for repatriation expenses and fees to be approved by the District Court. There is no evidence in the record that anyone at Main Justice in Washington, D.C. approved of, or was even aware of, Mr. Bailey's version of the arrangements between the parties, and no one in the United States Attorney's Office for the Northern District of Florida had the authority to approve such an arrangement.

As in *Cruz–Pagan*, the Department of Justice has adopted internal procedures requiring that agreements with the terms such as those put forward by Mr. Bailey to retain a forfeitable asset be approved by the Assistant Attorney General, Criminal Division. It is possible for the United States Attorney to perform his duties with respect to forfeitures without having unlimited contracting powers. *See Dolmatch Group, Ltd. v. United States,* 40 Fed.Cl. 431, 438 (1998). Plaintiff has not demonstrated that unlimited contracting authority is an "integral part of the duties assigned" to the United States Attorney in the area of forfeitures. *Cruz–Pagan v. United States,* 35 Fed.Cl. at 61 (quoting *H. Landau & Co. v. United States,* 886 F.2d at 324). The United States Attorney's Manual requires high level approval within the Department of Justice before forfeitable drug related assets may be transferred to an attorney as fees for services. Because the Department of Justice has adopted internal procedures precluding United States Attorney's Offices from exercising contracting authority over agreements with the terms similar to those put forward by Mr. Bailey, it is unreasonable to imply that the Department of Justice has granted or delegated the requisite contracting authority to the United States Attorney's Office in the case before this court. *Cruz–Pagan v. United States,* 35 Fed.Cl. at 62–63. The court does not find express or implied actual authority in any of the United States Attorney's Office personnel who negotiated or entered the arrangements at issue with Mr. Bailey.

*Institutional Ratification*

■ Plaintiff alternatively argues that, even if implied actual authority is not found, the alleged implied-in-fact contract was ratified by the government. The basic concept of ratification requires that a superior official "have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." *California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27–28 (1990), *aff'd,* 937 F.2d 624, 1991 WL 112816 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992). With respect to the element of knowledge of a subordinate's unauthorized act, the United States Supreme Court in *Beebe* stated that:

> Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. . . . Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them.

*United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901); *see also Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d at 1433 ("Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts.") (citing *United States v. Beebe,* 180 U.S. at 354, 21 S.Ct. 371), *reh'g denied* (1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *Henke v. United States,* 43 Fed.

Cl. 15, 27 (1999) ("Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing."); *Khairallah v. United States*, 43 Fed.Cl. 57, 64 (1999); *California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. at 27–28.

Plaintiff raises the issue of institutional ratification, when, in plaintiff's words, "a government agency as a whole is viewed as having ratified the contract," citing *Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982); *City of El Centro v. United States*, 922 F.2d 816 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); and *Janowsky v. United States*, 133 F.3d 888 (Fed.Cir.1998). The first two cases are addressed by the United States Court of Appeals for the Federal Circuit in *Janowsky*. In *Silverman*, a senior Federal Trade Commission (FTC) official promised the claimant that the FTC would pay for hearing transcripts. The senior official lacked contracting authority, but did possess authority to approve vouchers for goods and services, and the FTC retained and utilized the transcripts, thereby accepting the benefits flowing from the senior FTC official's promise of payment. " 'By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it.' " *Janowsky v. United States*, 133 F.3d at 891 (quoting *Silverman v. United States*, 230 Ct. Cl. at 710, 679 F.2d at 870). In *City of El Centro*, the Federal Circuit rejected the claimant's institutional ratification argument, distinguishing the case from *Silverman*. In *Silverman*, the FTC senior official at least had authority to approve vouchers for goods and services, and the government received a benefit from the transcripts received from the claimant. In *City of El Centro*, no official with any contracting authority had promised payment to claimant, and third parties received the benefits from claimant, not the government itself. *Janowsky v. United States*, 133 F.3d at 891–92 (discussing *City of El Centro v. United States*, 922 F.2d at 821, 823). After reviewing the *Silverman* and *City of El Centro* cases, the Federal Circuit, in *Janowsky*, remanded the case to the Court of Federal Claims in order to consider whether the government had received benefits from the claimant. *Janowsky v. United States*, 133 F.3d at 892; *see also Hawkins and Powers Aviation, Inc. v. United States*, 46 Fed.Cl. 238, 248–49 (2000) (discussing the *Janowsky* case).

In making his case for institutional ratification, plaintiff argues that the government accepted the benefits of the alleged contract between them, including his overseas property management services and the shifting of the risk to him of a possible loss in value of the Biochem Pharma stock. Plaintiff also argues that the Department of Justice was "involved and aware of the activities of Bailey." However, as noted above, plaintiff does not cite instances in the record reflecting that any Washington Department of Justice officials who were aware of his overseas property management efforts also acknowledged awareness of an agreement with plaintiff whereby any stock gain was to inure to his benefit.

As indicated by plaintiff, benefits were received by the government, however, receipt of those benefits is consistent with the government's view of the arrangements with plaintiff, which was that plaintiff would use Biochem Pharma stock for property management purposes, seek compensation for fees and expenses from the District Court, and return the balance of the Biochem Pharma stock for forfeiture to the United States. In the *Silverman*, *City of El Centro* and *Janowsky* cases discussed above, the terms of the alleged contracts between the parties were not at issue. Instead, the courts primarily were concerned with the government's receipt of benefits. Defendant acknowledges that government representatives in contact with Mr. Bailey were acting within the scope of their authority under the government's theory of the case, that is, permitting a defense counsel to use defendant's forfeitable drug related assets in order to maintain, liquidate and repatriate other forfeitable drug related assets, with compensation for the defense attorney to be approved by the District Court.

Defendant does not acknowledge and the record does not reflect that any Department of Justice officials who were aware of Mr.

Bailey's property management activities using Biochem Pharma stock also were aware at the time the arrangements were made or thereafter that Mr. Bailey understood the arrangements between the parties to include a term providing that any stock gain was to be his. In this regard, the present case is similar to *Henke v. United States*, 43 Fed.Cl. 15 (1999). In *Henke*, the claimant argued that his agreement with a DEA agent, who did not have the necessary authority to make the agreement, was nevertheless ratified by the DEA Administrator, who did have the necessary authority. *Id.* at 26. The claimant in *Henke* contended that the "agency as an institution should be charged with knowledge that he [the claimant] had worked out an arrangement with [DEA agent] Powers on several prior missions ...." *Id.* at 27. The court in *Henke* assumed for purposes of its opinion that the claimant could demonstrate that DEA officials were generally aware of the mission from which the claim stemmed. *Id.* The court, however, wrote: "What is missing in this case is any evidence that [DEA Administrator] Lawn understood that by his alleged approval of the mission he was acquiescing *sub silentio* in plaintiff's expectation of a $250,000 payment." *Id.* at 28 (footnote omitted). Similarly, although the record reflects that Department of Justice officials, including the Mary Lee Warren, Deputy Assistant Attorney General, Criminal Division, may have been generally aware of Mr. Bailey's role in the defense of defendant Duboc, Mr. Bailey's efforts to maintain, liquidate and repatriate the overseas drug related assets and even the use of the Biochem Pharma stock as a source of funds, there is no evidence that any of these officials were aware that Mr. Bailey also expected to exercise the right to any stock gain. "Knowledge of the facts is the essential element of ratification," *United States v. Beebe*, 180 U.S. at 354, 21 S.Ct. 371, an element missing from *Henke*, and missing from the case currently before the court. Plaintiff has not demonstrated either institutional ratification by the Department of Justice of his right to any stock gain, or ratification by an official possessing the requisite authority, such as the Assistant Attorney General, Criminal Division, of a provision giving Mr. Bailey the right to any stock gain.

## CONCLUSION

As reflected in the government representatives' concerns for conflicts of interest in Mr. Bailey's roles as defense counsel and repatriation representative, their understanding that Chief Judge Paul would expect maximum forfeitures and that defendant Duboc wanted maximum forfeitures to help in his sentencing prospects, the government's understanding that Mr. Bailey would be paid only for defense attorney time and expenses and for his property management work by application to Chief Judge Paul for the Judge's approval, and that the balance of the stock proceeds would be forfeited to the government, is credible. Mr. Bailey's perception that any appreciation in value beyond the approximately $5.8 million value of the Biochem Pharma stock at the time of the stock's transfer to Mr. Bailey would inure to Mr. Bailey's benefit, although perhaps his perception, was not agreed to by the appropriate government officials and no meeting of the minds required to form a contract occurred.

For the foregoing reasons, the court finds for the defendant. Plaintiff has not carried the burden of proving a meeting of the minds on a critical term of the alleged implied-in-fact contract, that any Biochem Pharma stock appreciation after the date of transfer to plaintiff's account would inure to plaintiff's benefit. Under the facts and circumstances of this case, no government official with authority to agree to such terms did so. During negotiations with Mr. Bailey and when the stock was transferred, the government officials expected that Mr. Bailey could be compensated for his repatriation efforts from the Biochem Pharma stock proceeds by petition to and approval by the District Court, but that the balance of the stock proceeds would be forfeited to the government. The Clerk's Office shall **DISMISS** plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant.

**IT IS SO ORDERED.**